# IN THE COURT OF APPEALS OF TENNESSEE
## AT JACKSON
### January 21, 2004 Session

## CATHERINE CLAIRE WILLCUTTS v. JOHN FRANCIS WILLCUTTS

**A Direct Appeal from the Chancery Court for McNairy County**
**No. 7438     The Honorable Martha Brasfield, Chancellor**

---

**No. W2002-02636-COA-R3-CV - Filed March 4, 2004**

---

This is an appeal of a final decree of divorce primarily as it concerns custody of the parties' children. The trial court awarded custody to mother and provided for a supervised visitation to father. Father appeals and, in addition to the custody issue, also presents issues pertaining to the trial court's out-of-court interview with the children and the mental examination of the parties. We affirm.

**Tenn. R. App. P. 3; Appeal as of Right; Judgment of the Chancery Court Affirmed**

W. FRANK CRAWFORD, P.J., W.S., delivered the opinion of the court, in which ALAN E. HIGHERS, J. and HOLLY M. KIRBY, J., joined.

Clark Lee Shaw, Nashville, For Appellant, John Francis Willcutts

Debera Bell-Beam, Linden, For Appellee, Catherine Claire Willcutts

**OPINION**

Catherine Clare Willcutts ("Mother" or "Appellee") and John Willcutts ("Father" or "Appellant") were married on December 18, 1986 in Gainesville, Florida. The parties' union produced three minor children.

The parties separated in September 1992. In 1996, Mother became a member of the Tsion Hadashah group, a religious commune of approximately 187 members, currently located on 100 acres of land in rural McNairy County, Tennessee, near the community of Rose Creek. Mother's brief refers to the commune as Rose Creek Community, and we will do so as well for the remainder of this opinion. The Rose Creek Community has a recognized group of male leaders and is operated in accordance with the specific and unique religious beliefs of the community.

Members of Rose Creek Community share food, money, cars, homes, and other such resources. At the time of this appeal, Mother and the parties' three children lived in a three bedroom trailer with another family of five. The children are home schooled by several of the adult female members of Rose Creek Community. The children have lived with Mother since the parties' separation in 1992.

Father currently resides in a rented home in Arkansas and is gainfully employed. Mother currently works part-time at the community's restaurant, Another Realm. The record indicates that Father has failed or refused to provide financial support for the children for the past several years.

Father contends that Rose Creek Community is an unsafe and unhealthy environment for the children, and has expressed sincere concern regarding the quality of the education being received by the children. He has also raised repeated allegations of sexual abuse of the children at the hands of the male leader(s) of Rose Creek Community; however, these allegations are not substantiated by the record.

The record in this case is littered with the superfluous pleadings and motions of Father filed as a *pro se* litigant. In the interest of providing a concise and structured account of the procedural history in this case, we will only address the pertinent motions of the parties and the orders of the trial court submitted thereon.

On August 19, 1999, Mother filed a Complaint for Divorce against Father in the Chancery Court of McNairy County, Tennessee, alleging mental and physical abuse, mental abuse upon the parties' children, and inappropriate conduct in the presence of the children.[1] Mother's complaint sought exclusive custody of the parties' children, and further averred that it was in the best interests of the children to deny Father "visitation at this time."

On October 7, 1999, Father filed an Answer and Counter Complaint for Divorce denying all allegations of abuse and inappropriate conduct and alleging that Mother was guilty of desertion, abandonment, and inappropriate conduct. Alternatively, he alleges irreconcilable differences sufficient to warrant dissolution of the parties' marriage. Father sought custody of the parties' children on grounds that they were in an "unsafe, unhealthy environment and are in danger of being dependent and neglected."

---

[1] Mother later amended her complaint to include as grounds for divorce Father's cruel and inhuman treatment.

Father next filed a Motion for Temporary Custody of the children on October 21, 1999. Father again noted concern regarding the children's safety and well-being, and stated that it was in the best interest of the children to award him temporary custody "pending a final hearing in this matter." On November 5, 1999, Mother filed response to Father's pleading and several related motions. Mother denied allegations of dependency, neglect, unsafe environment, and unhealthy living conditions. Mother asserted that Father had a "history of drug abuse, a criminal history, and a history of violent behavior." Mother moved for a continuance of the divorce proceedings pending the outcome of her mental evaluation, and further requested a home study of Father's residence.

A hearing on Father's Motion for Temporary Custody and Mother's responsive pleadings was held on November 8, 1999. On December 17, 1999, the chancery court entered a Temporary Order of Custody awarding Mother temporary custody of the children, subject to the visitation privileges announced by the court. The court ordered psychological evaluations of both parties and the minor children. The court further ordered home studies of each party's home situation. The court ordered the children to be tested "for education grade level," and the results submitted to the court and both parties. The court's order set forth a visitation schedule for Father and reiterated the rights of a non-custodial parent as required by statute.

On October 8, 2001, Mother filed a petition for an ***Ex Parte*** Order of Protection against Father. Mother averred that she was in "immediate and present danger of abuse by [Father]," and asked the court to issue an immediate order of protection "enjoining [Father] from abusing or threatening abuse of the petitioner." As the basis for her petition, Mother alleged that Father had made several threatening and abusive phone calls to her and engaged in profane, abusive, and dangerous conduct in the children's presence, causing the children to be fearful of the appellant.

Ten days later, the chancery court entered an ***Ex Parte*** Temporary Order of Protection against Father. The court's order restrained and prohibited Father from abusing, threatening, harassing, stalking, or committing acts of violence against Mother.

The record reflects that an order was filed on November 30, 2001, allowing Father's counsel to withdraw from representation.

A final hearing on the divorce proceedings was set for December 3, 2001. On the date of the hearing, Father, acting ***pro se***, filed a Motion for Continuance so as to allow him time to secure the services of new counsel. The parties entered an Agreed Order striking the matter from the trial docket and resetting it for trial on March 4, 2002.

On February 1, 2002, Mother filed a Motion for Sanctions[2], alleging that Father was "abusing the judicial process" and "driv[ing] up her attorney fees" by filing several frivolous "motions, answers to answers to motions and other filings, which counsel for Plaintiff has been forced to answer out of an abundance of caution." A non-jury trial commenced on March 4, 2002, with opening arguments and the testimony of several witnesses, including Mother. No court reporter was present to record the testimony, and Father has filed no Statement of the Evidence reciting or detailing the evidence presented on this day. The court, without objection from the parties or counsel, conducted *in camera* interviews of the parties' two oldest children. Neither Father nor Mother or her counsel were present during the interviews, and no court reporter was present. It appears that the trial court did not reveal the content of these interviews to the parties or counsel. At the end of the day, the court continued the trial until June 3 and 4, 2002.

On March 30, 2002 the court entered an order addressing several motions filed by Father. The court's order explicitly reserved ruling upon Mother's motions for sanctions until trial. The court further noted that the psychological evaluations of the parties and the children would be read *in camera*, and any pertinent information or recommendations contained in these evaluations and not deemed by the court to be detrimental to the children or parties, would be forwarded to counsel. The court specified:

> It is the policy of this Court to allow attorneys to read the psychological evaluations with the stipulation that they are entitled to tell their clients only the recommendations of the psychologist or psychiatrist. They may not divulge history or other statements made by the parties to the psychologist which were confidential or which would result in increased anger of the parties or which would cause detriment, either physically, emotionally, or psychologically, to the children.

In June 2002, Mother's attorney, Ms. Debera Bell-Beam ("Ms. Bell-Beam") filed a motion entitled "Ex Parte Motion for Protective Order for Plaintiff and for Plaintiff's Counsel and Plaintiff's Third Motion for Sanctions." Ms. Bell-Beam's motion states in pertinent part:

> On or about May 28, 2002, at 5:25 p.m., Defendant telephoned the law office of Debera Bell-Beam.
>
> **************************************************

---

[2] Mother filed a second Motion for Sanctions approximately three months later, alleging that Father authorized his sister to mail a letter to the chancellor and the court-appointed psychologist who evaluated appellee and the children. Mother alleged that the letter was an improper *ex parte* communication, and thereby moved the court to strike the letter and ensure that it was not entered into the record.

Debera Bell-Beam has attached to this motion an affidavit that contains the transcription of the message and will provide to the court the recorded message at the hearing on June 3, 2002.

The message and its tone have made Debera Bell-Beam fearful of her physical safety at the hands of Defendant and/or members of his family.

Moreover, Debera Bell-Beam has good reason to believe she may be in imminent danger of harm when the message is considered in context with Defendant's psychological profile that is part of the court's record and accounts of his past behavior.

Debera Bell-Beam moves this court for an immediate Ex-Parte Order of Protection as to Defendant and all members of his family as Defendant has caused her to be fearful of imminent danger of harm from him and them.

Debera Bell-Beam moves this court for a Permanent Order of Protection.

Counsel for Plaintiff further moves this Court for an immediate Permanent Order of Protection for Plaintiff, based on this recent communication and Defendant's threatening behavior.

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

Debera Bell-Beam moves this Court to order any communications between her and the Pro Se Defendant be done through the Clerk and Master's office as there should be no further need for direct communications between them.

Further, Debera Bell-Beam again moves this Court for sanctions against Defendant, who has committed assault against her by intentionally placing her in fear of imminent danger of harm.

The court granted Ms. Bell-Beam an immediate *Ex Parte* Order of Protection, and eventually entered an order granting Ms. Bell-Beam a permanent order of protection against Father. The court reserved ruling on Ms. Bell-Beam's motion for sanctions until the conclusion of the trial.

Trial resumed on June 3 and 4, 2002. During this two-day period, the court conducted separate, brief examinations of each of the children regarding two separate visits with Father since March 2002. These examinations were conducted without the presence of the parties or counsel, but

neither party or counsel objected to these examinations. At the end of this two-day period, the court continued the remainder of the trial until September 26, 2002.

The trial resumed and was completed on September 26, 2002. After conclusion of the trial, the court entered an order finding Mother's requests for sanctions "meritorious." The court specifically found that Father abused the judicial process by filing repeated frivolous pleadings, and ordered Ms. Bell-Beam to submit an affidavit setting out "the number of hours she has spent out of court reading and composing written responses to the documents" specified by the court, and "the number of in-court hours she spent making arguments against the content in [these] documents."

On October 4, 2002, the court entered a Decree of Divorce and Permanent Parenting Plan, granting Mother a divorce on grounds of inappropriate marital conduct. The decree divided the parties' marital property, and awarded Mother $2,500.00 in attorney's fees as alimony *in solido* for Father's filing of "numerous and unnecessary motions" and his failure to follow the court's instructions with regard to filing. The trial court determined that Father would not be required to pay all of Mother's attorney's fees due to her voluntary decision to remain underemployed, and further noted that Father's equity of $1,500.00 in a tract of real estate held by the parties as marital property, would "be credited toward [Mother's] attorney fees, which [Father] will owe to [Mother's] attorney for attorney fees and sanctions as set out in an order dated September 26, 2002, and for other attorney fees awarded herein."

With regard to the issue of custody of the minor children, the court examined all of the relevant factors set forth in T.C.A. § 36-6-106(a) and awarded primary physical custody of the children to Mother. The court specifically noted concern as to Father's mental illness, his refusal or failure to seek professional treatment or take the appropriate medication, and repeated episodes of volatility and instability, and found him guilty of mental abuse of his children. The court further recognized the unconventional environment and living conditions in the Rose Creek Community, and found Father's concerns with regard to the children's education to be valid. The court specifically found that Father failed to provide any proof to substantiate his claims of sexual abuse. Finally, the court's decree calculated Father's total child support arrearages for 1997 through 2001 as $40,620.00.

The Permanent Parenting Plan entered by the court gave Mother decision making authority with regard to the education and religious upbringing of the children. The plan specified that Father was entitled to supervised visitation with the children until such time as the court determined that it was in the best interests of the children to allow unsupervised visitation. The plan stated that the chancery court would consider granting Father unsupervised overnight visitation with the children under the conditions that Father complete parenting classes and an anger management program, and that he "seek counseling from a psychologist and medical treatment from a psychiatrist for his bipolar illness."

With regard to the children's schooling and education, the plan stated:

<u>Schooling of the Children</u>

The mother will be responsible for the educational decisions regarding the children with the following exceptions:

1. The children are presently being home schooled by their mother. The father has valid concerns regarding the quality of this education. A standardized test has been given to the children. The father believes that it was not correctly monitored and administered by a qualified test supervisor. The father will be allowed each year, beginning in the spring of 2003, to have all three children undergo a standardized test. The father will select the standardized test to be administered. He will be required to pay for these tests, and to pay for a qualified or certified person to monitor and administer the tests. The father will give the mother two weeks' notice as to the time, date, place, and the name of the monitor who will administer the test. The test results will be forwarded to the mother and the father.

2. All three children will be required to take the G.E.D. test when they turn age 17, if they are not attending a public school. If a child fails the test on the first attempt, the child will be required to take the test every four months thereafter, until the child passes the test or turns 18.

By order entered October 15, 2002, the court amended its divorce decree to include a judgment for $12,070.00 in child support owed by Father to Mother for January 1, 2002 through October 31, 2002. On October 24, 2002, the court entered an Order Setting Attorney Fees for fees accumulated by Mother as a result of Father's improperly filed motions, documents, and other matters. The court awarded Mother a total judgment of $2,274.00. The court later amended this amount, granting Mother a total modified award of $774.00 for attorney's fees. The modified award incorporated the set-off specified by the court in its decree of divorce.

Father filed a Notice of Appeal on October 26, 2002. Five days later, he filed three more motions that the chancery court interpreted as motions to alter or amend the court's final judgment, or, in the alternative, motions for new trial. The court denied all of these motions. On January 27, 2003, the court entered a statement concerning Father's filing of a "trial transcript," concluding that Father's filing was not a complete transcript of the trial. The court noted that a court reporter was only present for the proceedings held on June 3, 2002, June 4, 2002, and September 26, 2002. No court reporter was present on the first day of trial, March 4, 2002, and the court noted that Father did not furnish a Statement of the Evidence for evidence presented on this day.

On February 26, 2003, Mother filed a Motion to Dismiss Father's appeal for failure to comply with Rule 24(b), (c), or (d) of the Tennessee Rules of Appellate Procedure. This Court

denied the motion and Mother next filed a pleading that we treated as a petition for rehearing filed pursuant to Tenn. R. App. P. 39. This petition was also denied.

Father presents several issues for review, which we restate as follows:

Whether the chancery court abused its discretion "when it awarded [Mother] custody and limited [Father's] visitation.

Whether the chancery court committed reversible error by interviewing the children on two separate occasions without the presence of counsel.

Whether the chancery court committed reversible error by relying upon psychological evaluations or reports of the parties and children to render its opinion, despite having failed to meet the requirements of Tenn. R. Civ. P. 35.

Whether the chancery court erred in issuing an Order of Protection in favor of Mother's attorney against Father.

Whether Father is entitled to attorney's fees from his appeal in this matter.

Since this case was tried by the court sitting without a jury, we review the case *de novo* upon the record with a presumption of correctness of the findings of fact by the trial court. Unless the evidence preponderates against the findings, we must affirm, absent error of law. *See* Tenn. R. App. P. 13(d).

Father first asks this Court to consider whether the chancery court erred in designating Mother as the primary residential parent for the children. In child custody and visitation cases, the welfare and best interest of the child are the paramount concerns. ***Whitaker v. Whitaker***, 957 S.W.2d 834, 837 (Tenn. Ct. App. 1997); T.C.A. § 36-6-106 (2001). The determination of the child's best interest must turn on the particular facts of each case. ***Taylor v. Taylor***, 849 S.W.2d 319, 326 (Tenn. 1993); ***In re Parsons***, 914 S.W.2d 889, 893 (Tenn. Ct. App. 1995). In ***Bah v. Bah***, 668 S.W.2d 663 (Tenn. Ct. App. 1983), the Court established some guidelines for making the determination of the child's best interest:

We adopt what we believe is a common sense approach to custody, one which we will call the doctrine of "comparative fitness." The paramount concern in child custody cases is the welfare and best interests of the child. ***Mollish v. Mollish***, 494 S.W.2d 145, 151 (Tenn. Ct. App. 1972). There are literally thousands of things that

-8-

must be taken into consideration in the lives of young children, ***Smith v. Smith***, 188 Tenn. 430, 437, 220 S.W.2d 627, 630 (1949), and these factors must be reviewed on a comparative approach:

> Fitness for custodial responsibilities is largely a comparative matter. No human being is deemed perfect, hence no human can be deemed a perfectly fit custodian. Necessarily, therefore, the courts must determine which of two or more available custodians is more or less fit than others.

***Edwards v. Edwards***, 501 S.W.2d 283, 290-91 (Tenn. Ct. App. 1973) (emphasis supplied).

***Bah***, 668 S.W.2d at 666. The trial court must also consider factors set forth in T.C.A. § 36-6-106. These factors include:

> 1) The love, affection and emotional ties existing between the parents and child;
>
> (2) The disposition of the parents to provide the child with food, clothing, medical care, education and other necessary care and the degree to which a parent has been the primary caregiver;
>
> (3) The importance of continuity in the child's life and the length of time the child has lived in a stable, satisfactory environment; provided, that where there is a finding, under § 36-6-106(8), of child abuse, as defined in § 39-15-401 or § 39-15-402, or child sexual abuse, as defined in § 37-1- 602, by one (1) parent, and that a non-perpetrating parent has relocated in order to flee the perpetrating parent, that such relocation shall not weigh against an award of custody;
>
> (4) The stability of the family unit of the parents;
>
> (5) The mental and physical health of the parents;
>
> (6) The home, school and community record of the child;
>
> (7) The reasonable preference of the child if twelve (12) years of age or older. The court may hear the preference of a younger child upon request. The preferences of older children should normally be given greater weight than those of younger children;

(8) Evidence of physical or emotional abuse to the child, to the other parent or to any other person; provided, that where there are allegations that one (1) parent has committed child abuse, [as defined in § 39-15-401 or § 39- 15-402], or child sexual abuse, [as defined in § 37-1-602], against a family member, the court shall consider all evidence relevant to the physical and emotional safety of the child, and determine, by a clear preponderance of the evidence, whether such abuse has occurred. The court shall include in its decision a written finding of all evidence, and all findings of facts connected thereto. In addition, the court shall, where appropriate, refer any issues of abuse to the juvenile court for further proceedings;

(9) The character and behavior of any other person who resides in or frequents the home of a parent and such person's interactions with the child; and

(10) Each parent's past and potential for future performance of parenting responsibilities, including the willingness and ability of each of the parents to facilitate and encourage a close and continuing parent-child relationship between the child and the other parent, consistent with the best interest of the child.

T.C.A. § 36-6-106(a) (2001).

The presumption of correctness applicable to a trial court's findings of fact pursuant to Tenn. R. App. 13(d) applies in child custody cases. *Hass v. Knighton*, 676 S.W.2d 554, 555 (Tenn. 1984); *Whitaker*, 957 S.W.2d at 838.

It is apparent from the face of the chancery court's Final Decree of Divorce, that the court properly engaged in a comparative fitness analysis of the parties. The court specifically relied upon the factors set forth in T.C.A. § 36-6-106 to guide its analysis, stating the following findings of fact:

The Factors of T.C.A. § 36-6-106(a)

(1) The testimony has indicated that the children have a great deal of love and affection and strong emotional ties to their mother. The disturbing problems which exist between the father and the children stem from his bi-polar illness and are discussed above;

(2) The father has a good job and is certainly financially able to provide the children with food, clothing, medical care, etc. The mother has been the primary care-giver for the children since the parties' separation in 1992. She is the one who has looked after their

needs and provided them with food, clothing, medical care, education, etc. The father has not even provided child support for the children since 1996. The educational problems in the [Rose Creek Community] have been described above, and provisions for solving some of these problems are made in the permanent parenting plan;

(3) The children have lived with their mother, not their father, since the parties' separation. They have never lived in Arkansas where the father presently resides. The environment under which the mother presently lives is not one that is normally found in the United States, but the children are comfortable and happy in this environment, and the home is satisfactory;

(4) The mother has demonstrated that she is able to keep the family together, and that they are a stable and strong family unit. The father's mental illness has caused, and the Court feels will continue to cause, instability in the family unit if the father is named primary residential parent;

(5) The physical health of both parents is good. The mother had a major mental psychotic episode in approximately 1990. The evaluation performed by Dr. Robert W. Kennan shows that the mother is now mentally stable and free of any mental illness;

The father sustained a major psychotic episode in 1997, as set out above. Dr. Nicholaus Paal, Ph.D., who conducted the psychological evaluation of the father, made the following diagnostic impressions: (1) Bi-polar II disorder in partial remission; and (2) schizotypal personality disorder. Dr. Paal indicated that the personality disorder is an enduring pattern of thinking and behavior and that "the likelihood of another occurrence of amplified stress would seem to be rather high and preventative treatment would seem to be a wise course of action." Dr. Paal believed, as does the Court, that the Defendant is interested in the best interests of his children and would like to provide a suitable and positive home for them. However, Dr. Paal had concerns that the Defendant is at risk for further exacerbations of his illness, and that the risk could be minimized if he continued medical treatment, even when he is doing reasonably well. Dr. Paal further recommended that, if the Defendant were granted extended custody, the Court should mandate that the Defendant maintain "a treatment relationship with a mental health provider." As stated above, the Defendant has received no treatment for approximately two months, and his symptoms have escalated. The

-11-

Court has witnessed the actions of the Defendant throughout this proceeding. His mental illness presently prevents him from providing the suitable and positive home which he wants for his children;

(6) The home of the mother appears to be satisfactory. School problems are addressed in the attachment to the permanent parenting plan. The children are happy in their present environment;

The father is renting a 4-bedroom home, where each child will have his or her own bedroom, which would allow for privacy which the children do not now enjoy. Further, the father would send the children to public school, where he could monitor their academic progress in a more satisfactory manner than is presently being conducted;

(7) [Two of the minor children] wish to continue to live with their mother. The Court has not asked [the third minor child] her preference because she is presently 11 years old;

(8) While the father has alleged that his children are subjected to physical, sexual, and emotional abuse while in the home of their mother, he has been unable to prove these allegations. The children, themselves, have denied his allegations. The Court would note that the father has emotional problems and has been known to yell and scream, to call his children ugly names, to berate them, not for their misbehavior, but for actions of others which they cannot control, and to cause them to be extremely upset, and to cry, and to be fearful of him. The Court has stated above that his actions constitute emotional abuse;

(9) The father alleges that the members of [Rose Creek Community] where the mother lives have committed sexual abuse on children, but he has been unable to prove these allegations. The father lives alone; and

(10) The mother has, in the past, performed the parental responsibilities and appears to be able to continue to perform them. The father is willing to accept parental responsibility, but at the present has trouble in communicating with and disciplining his children in a proper manner. The father has complained of times when he called the mother to speak with the children and he was not allowed to talk with the children, and that members of [Rose Creek Community] have made fun of him and berated him in front of his children. This

-12-

problem has been solved, because the father now has specific times when the children call him and specific shared parenting times on the weekends.

The evidence in the record does not preponderate against the chancery court's designation of Mother as the primary residential parent for the children based upon the above-cited factors. Moreover, we note that Father failed to file a transcript of the evidence presented on March 4, 2002, the first day of trial, nor did he file a Statement of the Evidence for the proceeding on this day. In *Coakley v. Daniels*, 840 S.W.2d 367 (Tenn. Ct. App. 1992), this Court noted:

> Where the issues raised go to the evidence, there must be a transcript. In the absence of a transcript of the evidence, there is a conclusive presumption that there was sufficient evidence before the trial court to support its judgment, and this Court must therefore affirm the judgment. *McKinney v. Educator and Executive Insurers, Inc.*, 569 S.W.2d 829, 832 (Tenn. Ct. App. 1977). This rule likewise applies where there is a statement of the evidence which is incomplete. The burden is upon the appellant to show that the evidence preponderates against the judgment of the trial court. *Capital City Bank v. Baker*, 59 Tenn.App. 477, 493, 442 S.W.2d 259, 266 (1969). The burden is likewise on the appellant to provide the Court with a transcript of the evidence or a statement of the evidence from which this Court can determine if the evidence does preponderate for or against the findings of the trial court.

*Id*. at 370. *See also Scarbrough v. Scarbrough*, 752 S.W.2d 94, 97 (Tenn. Ct. App. 1988) ("When the trial court hears the evidence, but the evidence is not included in the record on appeal, it is presumed that the evidence supports the ruling of the trial court.").

Thus, insofar as the rulings of the court are premised on the evidence presented on March 4, 2002 hearing, we presume the evidence supports such rulings.

To the extent that Father's brief to this Court could be read as presenting for review the issue of whether the chancery court further erred in limiting Father to supervised visitation with the children, we find that the evidence in the record does not preponderate against the court's decision.[3] The Permanent Parenting Plan sets forth the following pertinent visitation times/conditions:

> Because of the Father's illness as discussed in the Final Decree of Divorce, ALL shared parenting with the children shall be supervised until the criteria set out below are met and the Court determines it will

---

[3] We note that Father's brief to this Court merely states that the trial court abused its discretion when it limited his visitation with the children, and includes no citation to the record or detailed argument in support of this argument.

-13-

be in the children's best interests to allow the Father unsupervised shared parenting. For weekend shared parenting, the mother may designate the person to supervise the shared parenting, or, if the person designated by the mother is unsatisfactory to the father, the father may seek supervision from the mother's relatives set out below or may seek professional supervision through the Department of Children's Services, the Carl Perkins Center, or some other professional counseling service.

Father will be entitled to shared parenting every other weekend, on Saturday, from 9 a.m. to 5 p.m. and on Sunday from 9 a.m. to 5 p.m. All exchanges shall take place at the McNairy County Criminal Justice Center.

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

The father will also have extended overnight shared parenting, which must be supervised by one of the following: Mr. Joseph Kinnan, the maternal grandfather, Mrs. Sandy Kinnan, the maternal grandmother, or Mrs. Mary Kinnan Ballard, the maternal aunt. Any of these individuals may pick up the children at the McNairy County Criminal Justice Center and transport them to the father if the father is not available to pick them up, himself.

The father may take the children anywhere he wishes within the continental United States as long as this extended shared parenting is supervised as set out herein. The father will be entitled to 30 days of extended supervised shared parenting per year, but it must be taken in increments of no more than 10 consecutive days at one time.

When the father wishes to exercise his extended shared parenting, he must give the mother 14 days' notice of his intent to exercise his shared parenting. He must tell the mother the dates and times on which he will exchange the children. He must also tell the mother how the children can be reached per Section 3.2.F. set out in the Permanent Parenting Plan.

Based on our foregoing discussion, we find that the evidence in the record does not preponderate against the trial court's decision to limit Father to supervised visitation with the children pending his completion of parenting and anger management courses, and contingent upon father receiving counseling and medical treatment for his mental illness, and the court's final approval of unsupervised visitation. Moreover, we note that Father has the option to enlist the services of a professional agency to supervise his visitations in the event he is unhappy with the individual

-14-

designated by Mother.  Further, the individuals identified by the court as proper persons to supervise Father's extended overnight visitations with the children all testified on Father's behalf at trial, and it appears as though Father has a civil relationship with each one.

Accordingly, we find that the chancery court did not err in designating Mother as the primary residential parent for the children and granting Father supervised visitation with the children pursuant to the shared parenting statement entered as an attachment to the Permanent Parenting Plan.

## II.

The second issue for review is whether the chancery court committed reversible error by interviewing the minor children on two separate occasions without the presence of counsel.

Father relies upon this Court's decision in *White v. White*, No. E1998-00664-COA-R3-CV, 2000 WL 66066 (Tenn. Ct. App. Jan. 27, 2000), for the proposition that the trial court's interviews with the children are reversible error.  We believe the Father's reliance on *White* is misplaced.  In *White*, the Court reversed the custody award "because we do not have a complete  record of the evidence heard by the trial judge." *Id.* at *1.  The Court noted: "The record establishes that the trial judge interviewed the eight year old child in chambers, *over the objection of the mother*, and the substance of that interview is not before us through no fault of the appellant." *Id.* at *1 (emphasis added).

In the case at bar, neither of the parties objected to the court's interview with the children on March 4, 2002 and the subsequent interview on June 3, 2002, without the presence of counsel.  The record contains the interview of June 3, 2002.  Under the specific facts of the case at bar, we do not find that *White* is controlling.

To reiterate, the chancery court twice conducted separate interviews with the children without the presence of parties or counsel.  On March 4, 2002, the chancellor interviewed the parties' two oldest children in chambers.  The chancellor did not interview the youngest child.  No court reporter was present to record the children's testimony or statements to the chancellor.  From our review of the record, it is apparent that the chancellor did not reveal the content of these conversations or interviews to the parties or counsel.  In a later proceeding, the trial court noted that these interviews were conducted with the consent of the parties and counsel.  At oral argument, Father's counsel appeared to suggest that Father did not consent to the interviews. However, no transcript or Statement of the Evidence from the March 4, 2002 proceedings was filed as part of the record on appeal. We reiterate that, in the absence of a transcript of the evidence or a Statement of the Evidence, "there is a conclusive presumption that there was sufficient evidence before the trial court to support its judgment, and this Court must therefore affirm the judgment." *Coakley v. Daniels*, 840 S.W.2d 367, 370 (Tenn. Ct. App. 1992) (citing *McKinney v. Educator and Executive Insurers, Inc.*, 569 S.W.2d 829, 832 (Tenn. App. 1977)).  In the case at bar, the trial court apparently felt that there was consent of the parties for the children's interviews and Father does not present anything contra, except his argument in this Court that he did not consent.

During the course of the June 3, 2002 proceedings, the chancellor interviewed all three children. The chancellor interviewed each of the three children separately, in a cleared courtroom. A court reporter was present to record the children's testimony, and these statements are included in the record on appeal. Neither Father nor Ms. Bell-Beam voiced objection to the court's decision to interview the children outside of their presence. At Father's request and with the children's consent, the chancellor disclosed the content of her interviews with the children to the parties and counsel.

In *Scarbrough v. Scarbrough*, 752 S.W.2d 94, 97 (Tenn. Ct. App. 1988), this Court noted that the practice of interviewing minor children in chambers as witnesses in a child custody case, without the presence of counsel, "should be discouraged." As in the case at bar, counsel for the respective parties consented to interviews of the children by the trial judge outside of their presence, and no transcript of the proceedings in chambers was taken. *Id*. This Court held:

> The only purpose for hearing from the child is to assist the trier of fact in making a determination of the issues before it, which in this case was to determine the best interest for the child. Every person of sufficient capacity to understand the obligation of an oath is competent to be a witness. T.C.A. § 24-1-101 (Supp. 1987). If there is some compelling reason for the proceedings to be held in chambers, the trial court, nevertheless, should determine the qualifications of a witness and such witness' testimony should be preserved in the record. In the case before us, it is clear that the trial judge, with the acquiescence of the parties, heard testimony of the child, but we do not have the benefit of this testimony in the record. When the trial court hears the evidence, but the evidence is not included in the record on appeal, it is presumed that the evidence supports the ruling of the trial court. *Turner v. Turner*, 739 S.W.2d 779 (Tenn. Ct. App. 1986). In the case at bar, the trial court had sharp credibility issues in making its determination as to the best interest of the child and in addition thereto considered the testimony of the child. Under the record in this case we cannot say that the evidence preponderates against the finding of the trial court that the best interests of the child are served by the award of custody to the Wife.

*Id*.

The *Scarbrough* court thus did not find the trial court's decision to interview the minor child outside of the presence of counsel to be reversible error.

We note some concern in the instant case regarding Father's status as a *pro se* litigant and the court's failure or refusal to disclose the testimony or statements of the children from their March 4, 2002 interviews. Father consented to all of the interviews conducted by the court. Although *pro se* litigants are entitled to fair and equal treatment, *Whitaker v. Whirlpool Corp.*, 32 S.W.3d 222, 227

(Tenn. Ct. App. 2000), *pro se* litigants are not entitled to shift the burden of litigating their case to the courts. *Id*. at 222. *Pro se* litigants are not excused from complying with the same substantive and procedural requirements that must be adhered to by other represented parties. *Id*. at 222. We thus find that Father is charged with the burden of entering proper objections to the chancery court's rulings and decisions, specifically the court's decision to interview the children outside the presence of counsel.

Our concerns are alleviated by the fact that there is ample evidence in the record to support the chancery court's decision that it was in the best interests of the children to designate Mother as the primary residential parent. In *Davis v. Smallwood*, No. 8614, 02A01-9706-CH-00131, 1998 WL 477649 (Tenn. Ct. App. Aug. 17, 1998), this Court noted:

> Most importantly, the order of the trial court makes it clear that the trial court relied on other evidence in making his decision. The order states that the decision of the trial court was based on the pleadings, the testimony of the witnesses, the interviews with the children and the record as a whole. "It has long been the rule in Tennessee that a private interview of the court with a minor child is not objectionable where the decision as to custody is based solely or primarily upon evidence heard in open court." *Todd v. Todd*, No. 03A01-9108-CH-284, 1992 WL 55578, at *2 (Tenn. Ct. App. Mar. 24, 1992) (citing *Hicks v. Hicks*, 26 Tenn. App. 641, 176 S.W.2d 371 (1943)).

*Id*. at *2.

In *Todd v. Todd*, No. 03A01-9108-CH-284, 1992 WL 55578 (Tenn. Ct. App. Mar. 24, 1992), the Eastern Section explained:

> [P]rejudice results, and therefore reversible error, where the trial court fails to disclose to the parties what occurred during the interview, which would afford the parties an opportunity to rebut statements made during the private interview, *and renders its decision based upon the elicited conversation*. Hence, the record must support the Trial Court's decision without regard to the Court's interview of the minor child to avoid prejudice to [the appellant].

*Id*. at *2 (internal citations omitted) (emphasis added).

In the instant case, the chancery court based its decision "upon the complaint filed by [Mother], the answer and counter-complaint filed by [Father], other motions and documents filed by the parties, the testimony of the witnesses, [and] exhibits on file...." Without consideration of the testimony of the minor children, we find that there is substantial evidence in the record of Father's

mental abuse of the children, physical violence toward his former wife, past struggles with substance abuse, and numerous instances of unstable and potentially dangerous behavior. For these reasons, we find that the chancery court's decision to interview the children outside of the presence of counsel was, at most, harmless error. We therefore find Father's issue to be without merit.

<h3 style="text-align:center">III.</h3>

Father next asks this Court to consider whether the chancery court "committed reversible error by using psychological reports to render its opinion without meeting the requirements of Tenn. R. Civ. P. 35." Father specifically argues that no factual basis existed to justify or support the court's order directing Mother, Father, and the three children to submit to psychological evaluations.

Tennessee Rule of Civil Procedure 35.01 states:

> **Rule 35.01 Order for Examination**
> When the mental or physical condition (including the blood group) of a party, or of a person in the custody or under the legal control of a party, is in controversy, the court in which the action is pending may order the party to submit to a physical or mental examination by a suitably licensed or certified examiner or to produce for examination the person in his custody or legal control. The order may be made only on motion for good cause shown and upon notice to the person to be examined and to all parties and shall specify the time, place, manner, conditions, and scope of the examination and the person or persons by whom it is to be made.

In her brief to this Court, Mother states that "[b]oth parties, who both then were represented by counsel, filed motions for examinations and neither filed objections." However, the record on appeal does not contain any motion filed by either of the parties pursuant to Tennessee Rule of Civil Procedure 35.01 requesting mental examinations or evaluations of the parties or the children. We note that a hearing upon Father's Motion for Temporary Custody was held on November 8, 1999. No transcript or Statement of the Evidence from this hearing was included in the record on appeal. On December 17, 1999, the trial court entered a Temporary Order of Custody, stating in pertinent part:

> THIS CAUSE came on to be heard on the 8th day of November, 1999, before the Honorable Martha Brasfield, Chancellor, upon the pleadings, testimony of witnesses, and the statements in open Court, and arguments of counsel, the Court finds and Orders as follows:
>
> ****************************************************

> That each of the parties will obtain psychological evaluations,
> including a social history, in addition each of the parties' children will
> receive a psychological evaluation and social history. Said reports will
> be submitted to the Court and attorneys for the parties.

From our reading of the chancery court's Final Decree of Divorce, it is apparent that the court considered evidence or information contained in Mother and Father's psychological evaluations in conducting a comparative fitness analysis of the parties. Although there is no evidence that a proper Rule 35.01 motion was filed requesting evaluation of the parties and children, and regardless of the fact that the trial court's order failed to "specify the time, place, manner, conditions, and scope of the examination and the person or persons by whom it is to be made," we find that there is substantial evidence in the record, without consideration of these evaluations, to support the court's finding that it was in the best interests of the children to designate Mother as the primary residential parent. Moreover, we note that the court's finding that Father was unstable and potentially dangerous was further based upon his behavior in court and documented acts of aggression or threatening behavior. The court noted that Father "displayed extreme volatility and instability throughout this court proceeding. His temper has flared in Court. He has threatened [Mother's] attorney through a telephone message, and [Mother's] attorney was granted an order of protection."

From our review of the record as a whole, we find that the court's reliance upon or consideration of the mental evaluations in designating Mother as primary residential parent of the children constitutes harmless error. We therefore find Father's issue without merit.

## IV.

Father's fourth issue is whether the chancery court erred when it issued an order of protection to Mother's attorney, Ms. Bell-Beam, against Father.

To briefly reiterate, Ms. Bell-Beam filed an ***ex parte*** motion on June 3, 2002, seeking an "immediate Ex-Parte Order of Protection," and a "Permanent Order of Protection" against Father. Ms. Bell-Beam also moved the court for an "immediate Permanent Order of Protection" for Mother against Father. Ms. Bell-Beam filed her motion pursuant to the Tennessee Rules of Civil Procedure, but failed to identify the precise rule. Ms. Bell-Beam's motion included an affidavit detailing a threatening phone message left by Father on her office answering machine on May 28, 2002. Ms. Bell-Beam stated that the message caused her to "fear imminent danger of physical harm from Mr. Willcutts and/or members of his family," and specifically requested the court to "order any communications between her and the Pro Se Defendant be done through the Clerk and Master's office as there should be no further need for direct communications between them."

On June 3, 2002, the court entered an immediate ***Ex Parte*** Order of Protection stating:

> Pursuant to an Ex Parte Motion for Protective Order for
> Plaintiff and for Plaintiff's Counsel and Plaintiff's Third Motion for

Sanctions, and the Affidavit attached thereto, Ms. Debera Bell-Beam is granted an Ex Parte Order of Protection as to the Defendant, John Willcutts. Further, any communication between Ms. Bell-Beam and Mr. Willcutts shall be done through the Clerk & Master's Office or will be made in open court. This shall include any oral or written direct communication between Ms. Bell-Beam and Mr. Willcutts.

A hearing for a permanent order of protection will be held on Monday, June 3, 2002. Further, a hearing will be held to determine if Mr. Willcutts is in civil contempt of court for the language used against Ms. Bell-Beam on the answering machine.

IT IS SO ORDERED.

After the June 3, 2002 hearing, the court entered a Protective Order for Ms. Bell-Beam against Father. The court's order states in pertinent part:

This court finds counsel's Motion for a Permanent Order of Protection well taken, and hereby orders [Father] to communicate with counsel for [Mother] only through mail and solely for matters to do with the above-styled case.

In its Final Decree of Divorce, the chancery court held, ***inter alia***, that the "orders of protection in favor of [Ms. Bell-Beam] against [Father] and in favor of [Mother] against [Father] shall continue for one year from the date this Order is filed with the Clerk & Master of McNairy County, Tennessee."

Father argues that Ms. Bell-Beam was not a proper party to seek protective relief pursuant to T.C.A. § 36-3-602. While Father may be correct in his argument that counsel for a party to a divorce and child custody case is not entitled to file a motion or complaint for protection under this statute, we note that Ms. Bell-Beam filed her motion pursuant to the Tennessee Rules of Civil Procedure and, although incorrectly titled, can be construed as a motion for a temporary restraining order or injunction pursuant to Tenn. R. Civ. P. 65.03 or 65.04. We base our finding upon the language utilized by Ms. Bell-Beam in her motion, and the court's order thereon. In effect, Ms. Bell-Beam moved the court to enter an order restricting the method and content of Father's communications with her. Tennessee Rule of Civil Procedure 65.01 states:

Injunctive relief may be obtained by (1) restraining order, (2) temporary injunction, or (3) permanent injunction in a final judgment. A restraining order shall only restrict the doing of an act. An injunction may restrict or mandatorily direct the doing of an act.

-20-

We read the court's protective order of June 3, 2002 as imposing a restriction upon Father to refrain from all communication with Ms. Bell-Beam other than that specified by the court in its order. Thus, he must not directly contact her and is required to communicate only by mail.

It appears that, although mistitled, Ms. Bell-Beam's motion was filed pursuant to Tenn. R. Civ. P. 65.03 or 65.04 and not T.C.A. § 36-3-602 as argued by Father.

Restraining orders and temporary injunctions may be granted during the pendency of an action and are similar in many respects. They both are authorized by a verified complaint or affidavit that the movant's rights may and will be violated and that the movant will suffer irreparable damage or injury. The court in which the action is pending may issue the restraining order or injunction pursuant to the provisions of Tenn. R. Civ. P. 65.03 and 65.04. Following these provisions, the court in the instant case was guided by the provisions of Tenn. R. Civ. P. 65.07, which states as follows in pertinent part:

> In domestic relation cases, restraining orders or injunctions may be issued upon such terms and conditions and remain in force for such time as shall seem just and proper to the judge to whom application therefor is made, and the provisions of this rule shall be followed only insofar as deemed appropriate by such judge.

In a notarized affidavit attached to her motion, Ms. Bell-Beam stated that she received a telephone message on May 28, 2002, from a man she believed to be Father. Ms. Bell-Beam noted that the caller did not state his name, but averred that she recognized Father's voice from previous conversations, and further stated that "the matters to which [the caller] referred were those involving Mr. Willcutts." Ms. Bell-Beam included a written transcript of the message, which reads:

> Hi Debera, umm.... You know, I gotta warn you about my sister and putting her on the war path... you know, she was the abused one... uh, you know, I never asked her to write that letter... she did it on her own accord and she does things like that. I asked her to send the payment to Dr. Kennan and she sent it and she told me she sent a letter with it... uh... I didn't do anything on this... uh... but considering how many letters she has written and how many have been thrown out and what she's been through and the fact that she showed up all the way from California for the November hearing in 1999... and Debera, you are really playing with fire. She's a meaner Bitch than you... you know, I don't know what this law profession is all about, but... you know... she thought she would try to prick some people's conscience... but uh... I'll tell you what... She's going to go after you like nothing else, honey. She's just really gonna go after you. I can't stop her now. You did this to yourself.

-21-

Ms. Bell-Beam stated that the tone and context of the message caused her "to fear imminent danger of physical harm from Mr. Willcutts and/or members of his family," and further noted:

> I am also well aware of Mr. Willcutts' documented struggle with anger and mental health issues, which serve to heighten my concern.
>
> Finally, this is the second inappropriate telephone call to my office from Mr. Willcutts, which further serves to heighten my concern.

It is apparent from our reading of Ms. Bell-Beam's motion and affidavit that she satisfied the requirements set forth in Tenn. R. Civ. P. 65.

The court's initial order includes an "Officer's Return" clause, establishing proper service of process, and the permanent injunction has a certificate of service thereon. This issue is without merit.

## V.

Based upon the foregoing discussion, we find that Father is not entitled to an award of attorney's fees for his appeal in this matter. In her concluding paragraph, Mother includes a request for attorney's fees, stating that "attorney fees should be paid by the Appellant." Mother's application for attorney's fees on appeal is granted and the amount will be determined on remand.

## VI.

The trial court's final decree is affirmed and the case is remanded for such further proceedings as may be necessary. Costs of this appeal are assessed against the appellant, John Francis Willcutts, and his surety.

_____
W. FRANK CRAWFORD, PRESIDING JUDGE, W.S.