IN THE COURT OF APPEALS OF TENNESSEE
AT NASHVILLE
February 19, 2004 Session

## TIFFANY REED v. CHRISTOPHER KIDD

**Appeal from the Juvenile Court for Montgomery County**
**No. 105-129     Raymond Grimes, Judge**

_____

**No. M2003-00650-COA-R3-JV - Filed April 1, 2004**

_____

This custody case involves two parents who have never been married and have not been involved in any prior custody determination regarding the child at issue. Father had never seen the child prior to filing this custody action and had not spoken with Mother since the child's birth in 1992. He was served with a paternity action in November 2001 and adjudicated to be the child's father. On June 4, 2002, he filed this custody action. The trial court determined that custody should remain with Mother and adopted a parenting plan offered by Mother. Father appealed. We affirm the trial court's determination.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Juvenile Court**
**Affirmed and Remanded**

WILLIAM B. CAIN, J., delivered the opinion of the court, in which PATRICIA J. COTTRELL, and FRANK G. CLEMENT, JR., JJ., joined.

Carrie Kersh Gasaway, Clarksville, Tennessee, for the appellant, Christopher Kidd.

Christine Zellar Church, Clarksville, Tennessee, for the appellee, Tiffany Reed.

### OPINION

Christopher Kidd and Tiffany Reed, parents of the child at issue, dated in 1991 while Mr. Kidd was on active duty with the United States Army in Fort Campbell, Kentucky. While they were dating, Ms. Reed became pregnant. After finding out that Ms. Reed was pregnant, Mr. Kidd presented her with a ring. Whether this ring was an engagement ring or a "promise ring" is disputed by the parties. In October 1991, shortly after finding out that Ms. Reed was pregnant, Mr. Kidd was discharged from the Army and returned to Texas. The parties agree that there was some talk of Ms. Reed moving to Texas with him. On New Year's Eve 1991, Mr. Kidd returned to Tennessee to visit

Ms. Reed; however, that was the last time Mr. Kidd saw Ms. Reed until after a paternity action was commenced by the State of Tennessee in November of 2001.

It is Mr. Kidd's assertion that, during a telephone conversation between the parties, Ms. Reed stated that she intended to have the child placed for adoption. Ms. Reed denies ever making such statement or having any such intention. On the day A.S. was born, April 4, 1992, Ms. Reed's mother contacted Mr. Kidd to inform him of the birth. Mr. Kidd had no further contact with Ms. Reed or his child until the paternity action was filed.

In 2001, after Ms. Reed began receiving state services, the District Attorney contacted Mr. Kidd to notify him that he might be the father of a child, A.S., in Tennessee. After being served with a paternity suit, Mr. Kidd requested a DNA test. When this test came back positive, he requested a second test to confirm the results. After the second test, again, confirmed him to be the father of A.S., he requested that she be sent to him in Texas for a meeting. However, Ms. Reed refused and suggested that Mr. Kidd come to Tennessee for an initial meeting. At this time, A.S. was approximately ten years old.

An Order of Paternity was entered after a hearing on January 31, 2002 and child support was established based on imputed income, as Mr. Kidd failed to provide the court with any proof of actual income. However, Mr. Kidd refused to pay any child support until September 2002. On June 4, 2002, Mr. Kidd filed a Petition for Parenting Plan requesting primary residential custody of A.S.

On July 20, 2002, Mr. Kidd drove to Tennessee to meet his daughter. After this initial meeting, Ms. Reed determined that it would be acceptable for A.S. to return to Texas with Mr. Kidd for a visit. A.S. spent approximately a month with Mr. Kidd before returning to Tennessee prior to the start of school. She continues to speak with her father occasionally on the telephone and visit him during holidays.

Mr. Kidd lives in Lubbock, Texas with his wife, whom he married in 1999, and two children. One daughter is Mr. Kidd's from another prior relationship and the other daughter is Mrs. Kidd's from a prior relationship. These children were nine and twelve at the time of the trial. The Kidd family lives in a three bedroom two car garage home in a middle class neighborhood. Mr. Kidd is currently a student, and his wife owns a maid service business.

Ms. Reed married shortly after A.S. was born. Her husband is a man she began dating while she was pregnant. She has two sons by this marriage. Approximately six years after she married, Ms. Reed was abandoned by her husband and left as a single parent with three children. Her husband's whereabouts are currently unknown, and she has been unable to obtain a divorce. She has a degenerative muscular disease and receives only disability income. In 1999 she began a relationship with Michael Coyne. They have been living together since 1999 and intend to marry once Ms. Reed is able to obtain a divorce. As a result of some financial difficulties, Ms. Reed, Mr. Coyne, and the three children currently live in a trailer park. However, in spite of the families' current financial difficulties, A.S. was found to be a bright, happy and well adjusted child.

At the trial of this matter, Mr. Kidd tried to make much out of Ms. Reed's current financial situation and living circumstances. In addition, he relied heavily on A.S.'s numerous absences from school in the past to show himself comparatively more fit as a parent. Also, both parties attempted to point out the other's alleged unreasonable behavior with regard to allowing the other contact with A.S. The only witnesses who testified at the hearing were Mr. Kidd, Mr. Kidd's wife, Ms. Reed, Ms. Reed's boyfriend, and A.S. We find the testimony of A.S. to be particularly enlightening.

Q       [A.], you are in the 5th grade, right?
A       Uh huh (meaning yes by sound).
Q       I want you to tell the Judge a little bit about what you would like to see happen with your dad, as far as getting to know him and all of that?
A       I would like to live with my mother while I'm in school. I would like to visit him over the summer and any break I get while I'm in school; but I don't think I'm ready to live with him just yet.
Q       Okay. I know it has got to have been a little surprise to you, how do you think it's going as far as you getting to know him?
A       Good.
Q       You like your dad?
A       Yes.
Q       How has your mom been about encouraging you to get to know your dad?
A       She wants me to get to know him. She wants me to call him, get time with me.
Q       Do you in anyway feel like she disapproves of your spending time with your dad and getting to know him?
A       No.
Q       When you were little - - real little, when did you first know that your dad was some place else? Can you remember when you first learned that your dad lived somewhere else?
A       I was really little. I was four or five.
Q       That's what you can remember?
A       Uh huh (meaning yes by sound).
Q       Did you ever think that anybody else was your dad?
A       No.
Q       When your dad calls you - - do you call him dad or do you call him Chris or what?
A       I call him Chris.
Q       How do you feel about calling him dad?
A       Uncomfortable.
Q       You think it is going to come to you?
A       Uh huh (meaning yes by sound).
Q       And as far as phone calls, what do you want to do about being able to call him? Has that been a problem for you?

A       No.

Q       Do you have any kind of calling card where you can call him?

A       Yes.

Q       Who got you that?

A       My mom.

Q       Do you know where it is?

A       I think she has it in her room.

Q       Okay.  Did you call him from her room the last time?

A       Yes, I did.

Q       Do you have your own room right now?

A       Uh huh (meaning yes by sound.)

MS. CHURCH:        That's all.

CROSS-EXAMINATION BY MS. GASAWAY:

Q       Have you told your dad that you wanted to live with him?

A       (Head nodded in the negative).

Q       Never said that to him when you were down there maybe visiting?

A       (Head nodded in the negative).

THE COURT:        You need to say yes or no.  You need to respond, of course, the court reporter - - this lady right down here is taking notes of what we say, so when you talk or when you answer, you've got to say yes, no, whatever.

Q       (By Ms. Gasaway) That didn't happen?

A       No.

Q       Now isn't it true that your mom has listened to some of the phone conversations with your dad?

A       Yes.

Q       And that's happened more than once?

A       Yes.

Q       Does that happen regularly?

A       No.

Q       When was the last time it happened?

A       I don't remember.

Q       You told us that you think that you were about four or five when you learned that your dad lives somewhere else?

A       Yes.

Q       Before that did you think that Mr. Reed was your father?

A       I don't remember.

Q       Okay, you just don't remember. Do you remember calling him dad?

A       Yes.

Q       And after he stopped living with you all, do you remember that?

-4-

A        Yes.

Q        Was that about the time you think you learned that your dad lives somewhere else?

A        No.

Q        No. Was it before that?

A        Yes.

Q        When he stopped living with you all, did you begin writing some letters to your dad, to Mr. Kidd?

A        Yes.

Q        And what did your mother tell you about those letters?

A        She told me that when she got the chance that she would send them.

Q        She was going to mail them to him?

A        Yes.

Q        And did you think that's what she did?

A.        No. I don't remember any of them being sent.

Q        Okay. Did you ever give them to her to be sent?

A        Yes.

Q        Did she ever come back to you and say, [A.], I'm sorry I didn't send the letters?

A        Yes.

Q        Okay. You've been down to Texas now to stay with your dad twice?

A        Yes.

Q        How was it?

A        It was fine.

Q        You have two other sisters there, is that right?

A        Yes.

Q        How did you get along with them?

A        We get along okay. We argue sometimes.

Q        Like sisters?

A        Yes.

Q        Did you have fun when you were down there?

A        Yes.

Q        Can you remember - - let's go back to last summer when you first met your dad. What was that like?

A        I was kind of scared from meeting him for the first time.

Q        When you went down there last summer, do you remember what clothes you took with you?

A        Yes.

Q        You didn't take many clothes, did you?

A        No.

Q        Do you remember why that was?

A    No.

Q    Who packed your bags?

A    I think it was my mom or grandma.

Q    Okay.

MS. CHURCH:    What kind of a bag did you have?

THE WITNESS:    I think I brought two book bags because I couldn't find any suitcases.

Q    (By Ms. Gasaway) [A.], has your mom pawned or sold some of your stuff?

A    Yes. My play station and our movies because we got a DVD player, we didn't use those anymore.

Q    Did you ever indicate to you dad that you were upset because your mom had sold some of your stuff?

A    Yes.

Q    And you got a fair amount of Christmas presents when you went down to your dad's, right?

A    Yes.

Q    And did you have some discussions with him about not wanting to bring some of that stuff home?

A    Yes.

Q    Was it that you were concerned that it might get sold?

A    No.

Q    No. You don't remember saying that to him?

A    No.

Q    Okay. Have you had any problems e-mailing your dad?

A    Yes.

Q    Tell the Court about that?

A    I have - - we don't have a computer, so I had to go over to my aunts. I haven't tried to e-mail because we haven't been over there much.

Q    Have you ever asked to e-mail him, but you were told that you couldn't?

A    No.

Q    Do you remember telling your father that your mother wouldn't let you receive any mail from him?

A    No.

Q    You don't remember being upset and telling your dad that?

A    No, I might have.

Q    You might have?

A    Uh huh (meaning yes by sound).

Q    Okay. Has that happened?

A    No, it didn't.

Q    But your mom has told you that your last name is not Kidd, hasn't she?

A Yes.
Q That upset you, didn't it?
A Yes.
Q Alex, isn't it true that your mom says bad things about your dad in front of you?
A I don't - - she didn't say anything bad in front of me.
Q Has she said bad things about him that you've heard?
A No.

After hearing all the testimony, the trial judge made his initial ruling from the bench in detailed findings that are fully reflected in his final order of March 6, 2003 as follows:

> This cause came on to be heard on the 7th day of February, 2003 before the Honorable Raymond Grimes, Judge of the Juvenile Court for Montgomery County, Tennessee. Present were the Petitioner and the Respondent and their counsel. This case then came on to be heard on the Respondent's petition for a parenting plan. Based upon the testimony of the parties, their witnesses, the evidence presented, the arguments of the parties' respective attorneys and the record as a whole, the Court finds as follows:
>
> 1. After the previous order of this Court in January 2002, the Respondent had a second DNA test performed. The results are consistent with the previous orders of this Court declaring the Respondent to be the biological father of the minor child.
>
> 2. The Court finds that the parenting plan proposed by the Petitioner should be adopted by the court as being in the child's best interests, with certain modifications.
>
> 3. [A.S.] is a bright fifth grade student who has lived with her mother since her birth. The parties disagree as to whether the Respondent thought the child was given up for adoption, but the record is clear that the Petitioner became pregnant and soon thereafter, the Respondent left Tennessee never to return.
>
> 4. The record is clear that after a paternity action was filed by the Petitioner, the Respondent steadfastly refused to acknowledge that he was the father. Despite the results of the first DNA test, the Respondent requested a second test. Both tests found a 99.98 or higher probability that the Respondent was the biological father of the child.
>
> 5. The Petitioner is clearly disabled, suffering from a degenerative muscular disease. The child was indicated (sic) for truancy in 2001 - 2002 school year and even perhaps in kindergarten, but her grades continued to be excellent in spite of her absences. In the 2002 - 2003 school year her attendance was almost perfect and her grades are exemplary.
>
> 6. The report by the teacher on the minor child's report card is "[A.] works hard, demonstrates a responsible, mature attitude towards her word (sic) and her behavior."

7. The Respondent's wife reports that the minor child is "always happy." She further testified that the child is good in front of adults and interacts well with others. The court finds that the Petitioner has done well in raising this child.

8. Although the Petitioner's financial conditions are not good, and in spite of the fact that the Petitioner's family was evicted from her home and is now living in a mobile home park, the minor child continues to thrive.

9. Although the Petitioner's living arrangements may have initially been a concern by the Court, the Court finds that Mr. Coyne has lived with the Petitioner for a number of years and that he has recently contributed most, if not all, of a VA disability settlement in the amount of over $14,000.00 for the family purposes. There appears to be stability in the minor child's life when she is living in the Petitioner's home.

10. The Respondent has steadfastly denied the paternity of this child, even after the first DNA test was over 99% probability that he was the father. In spite of his denials, he testifies to this Court "I've been robbed for ten years." Even after an order of support was entered, the Respondent refused to pay anything towards that order until this Court found him in contempt. Even after the finding of contempt, the Respondent still did not pay support for two more months. The Respondent may have a better financial position than the Petitioner, and have a three bedroom home with a garage, but he does so without paying his court ordered obligation of child support. The Respondent complains that the minor child could have nicer clothes, and this Court finds that would be true if the Respondent met his responsibilities to the child and paid his child support regularly.

11. In applying T.C.A. § 36-6-106 and using a parent's fitness analysis the Court finds that the best interests of the minor child warrant that the Petitioner be the primary residential parent. Her proposed parenting plan is approved [with some minor modifications].

. . . .

IT IS THEREFORE ORDERED, ADJUDGED AND DECREED as follows:

1. This court adopts the parenting plan which is attached as Exhibit A to this Order. Each and every provision of the parenting plan is made an Order of this court and is subject to enforcement by this court.

2. The Respondent's request to review the amount of child support previously set by this court was not addressed by the Respondent in his proof. The request is denied for lack of evidence.

3. The minor child is a female child, whose name shall be changed to [A.L.K.].

4. Any outstanding costs of this action are taxed to the Respondent.

The standard of review in child custody cases is *de novo* upon the trial court's record accompanied by a presumption that the court's findings are correct unless a preponderance of the

evidence is otherwise. *Hass v. Knighton*, 676 S.W.2d 554 (Tenn. 1984). Custody rulings such as this are fact specific and require the court to weigh numerous considerations. However, the ultimate goal is to promote the best interests of the child. *Gaskill v. Gaskill*, 936 S.W.2d 626, 630-31 (Tenn.Ct.App. 1996).

> Custody decisions are factually driven and require the careful consideration of numerous factors. *See Holloway v. Bradley*, 190 Tenn. 565, 571, 230 S.W.2d 1003, 1006 (1950); *Scarbrough v. Scarbrough*, 752 S.W.2d 94, 96 (Tenn.Ct.App. 1988). Since these decisions often hinge on the parties' credibility, appellate courts are reluctant to second-guess trial judges who have observed the witnesses and assessed their credibility. *See Gilliam v. Gilliam*, 776 S.W.2d 81, 84 (Tenn.Ct.App. 1988). Accordingly, we decline to disturb custody decisions unless they are based on a material error of law or the evidence preponderates against them. *See Hass v. Knighton*, 676 S.W.2d 554, 555 ( Tenn.1984); *Gaskill v. Gaskill*, 936 S.W.2d 626, 631 (Tenn.Ct.App. 1996); *Griffin v. Stone*, 834 S.W.2d at 301.

*Adelsperger v. Adelsperger*, 970 S.W.2d 482, 485 (Tenn.Ct.App. 1997).

The analysis to be made is one of comparative fitness between the two parents and "[t]here are literally thousands of things that must be taken into consideration in the lives of the young children." *Bah v. Bah*, 668 S.W.2d 663, 666 (Tenn.Ct.App. 1983) (citing *Smith v. Smith*, 220 S.W.2d 627, 630 (Tenn. 1949). Many of the factors that must be taken into account in determining custody are enumerated in Tennessee Code Annotated section 36-6-106 as follows:

(1) The love, affection and emotional ties existing between the parents and child;

(2) The disposition of the parents to provide the child with food, clothing, medical care, education and other necessary care and the degree to which a parent has been the primary caregiver;

(3) The importance of continuity in the child's life and the length of time the child has lived in a stable, satisfactory environment; . . .

(4) The stability of the family unit of the parents;

(5) The mental and physical health of the parents;

(6) The home, school and community record of the child;

(7) The reasonable preference of the child if twelve (12) years of age or older. The court may hear the preference of a younger child upon request. The preferences of older children should normally be given greater weight than those of younger children;

(8) Evidence of physical or emotional abuse to the child, to the other parent or to any other person; . . .

(9) The character and behavior of any other person who resides in or frequents the home of a parent and such person's interactions with the child; and

(10)    Each parent's past and potential for future performance of parenting responsibilities, including the willingness and ability of each of the parents to facilitate and encourage a close and continuing parent-child relationship between the child and the other parent, consistent with the best interest of the child.

Tenn. Code Ann. § 36-6-106(a)(1-10) (2001).  Trial courts are given a wide discretion to make custody decisions and should also take into account the parents' demeanor and credibility.  Thus, appellate courts are reluctant to second-guess a trial court's decisions regarding child custody. *Nelson v. Nelson*, 66 S.W.3d 896, 901 (Tenn.Ct.App. 2001); *Koch v. Koch*, 874 S.W.2d 571, 575 (Tenn.Ct.App. 1993).

The trial court had the opportunity to witness the character and demeanor of both parents and the child and made specific findings with regard to the facts and A.S.'s best interests.

In looking at the factors in section 36-6-106, we cannot say that the evidence preponderates against leaving custody with Ms. Reed.  It is undisputed that Mr. Kidd has been totally absent from the child's life for approximately 10 years.  Although Mr. Kidd is making an effort at this point to become acquainted with A.S. and they appear to be establishing a good relationship, A.S. certainly does not have the emotional ties that exist between her and her mother.  In spite of her limited means, Ms. Reed appears to be allocating all financial resources possible towards the best interests of her children, and the trial court found that A.S. was not adversely affected by the family's current financial situation, specifically finding that "the minor child continues to thrive."  Further, we agree that the current financial circumstances under which A.S. lives are partially caused by Mr. Kidd's own refusal to pay child support.  It is undisputable that continuity is important in a child's life.  A.S. has lived with her mother her entire life and is still only becoming acquainted with her father.  The court also made a specific finding that there was stability within the family unit of Ms. Reed, her boyfriend, and Ms. Reed's children and further found that Ms. Reed had done a good job of raising A.S. so far.  We agree.  Although Ms. Reed is in poor health, there was no evidence introduced showing that this health adversely affected her ability to parent A.S.  A.S. is a bright girl and an excellent student with excellent grades, in spite of some past problems with truancy.  Even though A.S. was not quite eleven years old at the time of trial, her testimony reveals her to be a mature, intelligent, well adjusted child.  Her own testimony revealed that she wished to live with her mother during the school year and visit her father during summer and spring breaks in order to continue to get to know him better.  Although the trial court felt that both parties had shown some interference and unreasonableness with regard to the others' contact with A.S., the testimony of A.S. revealed that many of the allegations made by the parties, especially the allegations made by Mr. Kidd, were unfounded.

We find that the evidence does not preponderate against the trial court's decision to leave custody with Ms. Reed and to adopt her proposed parenting plan, with some modification.

Mr. Kidd also requested that his child support obligation be adjusted to take into account his other child for whom he has primary residential custody. He bases his argument on a recent amendment to Tennessee Code Annotated section 36-5-101 which states as follows:

> In addition to any other subtractions, calculations of net income under the guidelines shall take into consideration the support of any other children the obligor is legally responsible to provide. Children of the obligor who are not included in a decree of child support, but for whom the obligor's legally responsible to provide support and is supporting, shall be considered for purposes of reducing the obligor's net income or in calculating the guideline amount. Such children may be considered by the court as a reason for deviation from the guidelines.

Tenn.CodeAnn. § 36-5-101(e)(4)(Supp.2003). However, this amendment became effective on July 1, 2003 and does not provide for retroactivity. Also, the order of child support was entered on March 28, 2002 and not appealed by Mr. Kidd. At the custody hearing, the trial court merely incorporated its March 28, 2002 child support order into its Order and Parenting Plan and made no new ruling with regard to support, specifically stating that support was not addressed at that time. As such, it is not appropriate for this court to modify Mr. Kidd's child support obligation. If Mr. Kidd wishes to obtain a modification of his child support obligation, it should be done at the trial court level based on statutory guidelines for modification.

The judgment of the trial court is in all respects affirmed and the case remanded to the trial court for such further proceedings as may be necessary. Costs are assessed against Appellant.

_____
WILLIAM B. CAIN, JUDGE

-11-