SMITH *v.* SMITH.

(*Knoxville*, September Term, 1948.)

Opinion filed May 6, 1949.

Cecil D. Meek, Knoxville, for appellant.

Goddard & Gamble, Maryville, for appellee.

Mr. Justice Burnett delivered the opinion of the Court.

This suit involves the custody of a four year old boy. In 1946, the parties, the caption of this lawsuit, were divorced. Subsequently both parties remarried. In January 1948, the mother who had since her divorce from Smith, remarried, filed a petition in the original divorce suit in which she sought exclusive custody of her three children. The father answered this petition and filed a cross-petition in which he prayed for the custody of the three children of the parties. Max H. Young and wife, (no relation to the parties) filed an intervening petition in the cause in which they requested the exclusive custody of the middle child—the only one of the three children involved in this litigation.

The trial judge awarded the oldest and the youngest child (both boys) to the mother and awarded the middle child to the intervening petitioners, Youngs. There was no appeal from the decree awarding the oldest and youngest son to the mother. This petition involves alone the awarding of the middle son to the intervening petitioners.

The record amply supports the finding of fact made by the Court of Appeals who affirmed the finding of the trial judge. The findings of fact as made by the Court of Appeals is as follows:

"Briefly stated, the facts are: The father and mother of this child did not assume the responsibilities and obligations of husband and wife and parents seriously. Their marriage ended in a liquor drinking party in which they participated. They failed to provide for their children in a substantial way. The mother was not in the best of health when they separated nor when the divorce was granted. The children were unwanted, it seems, by everyone. Their mother did not want them. Their father did not want them. Their grandparents did not want them. No member of either family wanted them. They were, to a great extent, forced upon their paternal grandparents. The home of these paternal grandparents was wholly unsuited as a place for these children to live. Their existence consisted of a series of efforts on the part of everyone to put them off on the other person. They were shuttled back and forth from one to another with no stability nor permanency about their location. The parents engaged in the shameful practice of discussing, in the presence of these little boys, that nobody wanted them; and that they had nowhere to go. They were shown to be normal, healthy, fine children. It is

difficult to conceive of the mental pain and torture that they suffered when they heard these discussions.

"Their mother was neglectful in her attitude towards them. She went five months without seeing them at a time when she was able physically and financially to see them. Her present home surroundings do not present a very bright future for her children. The home is worth $4500.00 with a debt against it of $3800.00. Her present husband makes $200.00 a month. That amount is the family income. It seems to be a fair conclusion that with this income they must support four people (exclusive of James Patrick), make payments on their home, and pay all necessary expenses of maintaining it. Her husband frankly stated that he was expecting help from her former husband. It stated that if such help were not received he would have a "tough" time supporting his wife and three stepchildren. It seems that he and his wife are making an honest effort to maintain a good, respectable home. She established a good reputation by the testimony of her neighbors:

"Support for the children from their father seems well-nigh impossible. He has overhead expenses which take all of his salary except $15.00 a month. These expenses will increase for he is expecting another child immediately which will require the ordinary expenses in such cases.

"James Patrick Smith went into the home of the intervening petitioners under unusual circumstances. His father had advertised for a home for the children in the fall of 1946. He was about two years old at that time. Mr. and Mrs. Max Young were a young married couple who had no children. They had been married six or eight years. Neither of them had ever been married

previously. They wanted a child in their home for the Thanksgiving and Christmas holidays, so they answered the advertisement and arrangements were made with the father of the child for them to take James Patrick. At that time they had no idea of keeping him permanently.

"In the early part of 1947, after the holidays, the child had no place to go; so he continued to stay in the home of Mr. and Mrs. Young. The record shows the reputation and character of this young couple are above reproach in every way. They do not drink liquor and never have. They have been active in Church and Sunday School work all their lives. James Patrick is taken to Sunday School by them every Sunday. They love him and he loves them. He is thoroughly adjusted to Mr. and Mrs. Young and their home, and they are adjusted to him. Mrs. Young does not work, but devotes all her time to her home and this child.

"They have an excellent small home with no mortgage against it, and the home is well furnished. It is their desire to keep James Patrick, who is about four years old now, care for him, educate him, love him and treat him as their own child and adopt him if possible, thus giving him a legal claim upon them. Mr. Young holds a responsible position at a salary of $216.00 a month.

"Thus we see that James Patrick Smith, although he has been only two to four years old while living with Mr. and Mrs. Young, has done for himself, by his own personality, what his father and mother would not or could not do for him: he has won for himself a substantial, lovely home where he can be permanently, comfortably, and securely located with good, highly respected, Christian people who will love and care for him; and we do not intend to take that home away from him under the

facts here appearing. We are primarily concerned with the welfare of James Patrick and not with the satisfaction of the natural desire of his mother to have his exclusive custody committed to her.

"The trial judge was definitely of the opinion that the welfare of James Patrick Smith demanded that his custody be awarded to the intervening petitioners. We cannot hold that the evidence preponderates against that conclusion."

The Court of Appeals further says: "The issue in this Court is limited to one question: Does the evidence preponderate against the decree of the trial court to the effect that the exclusive custody of James Patrick Smith was awarded to the intervening petitioners?"

The petition here raises the obvious question, that is, that since the two courts below have concurred in finding that the mother is a suitable person to have the custody of her oldest and youngest child that therefore the court should have as a matter of law granted custody also to the mother of the middle child. That since these courts have concluded that the mother is a suitable person to have custody of her other two children then that it necessarily follows that she is a suitable person to have custody of this middle child and that, therefore, as a matter of law the court erred in taking this middle child from her and placing its custody in the Young's— unrelated parties.

■ Under the principles of the common law, the father had the exclusive and legal right to the custody and services of his minor child. *State* v. *Paine*, 23 Tenn. 523. Now by statute, Code Section 8463, "fathers and mothers are joint and equal natural guardians of their minor children . . ."

■ Under modern law it is universally held that the parent has no absolute right to the custody of his own child. The courts uniformly have held that the question is the welfare of the child. *State* v. *Kilvington*, 100 Tenn. 227, 234, 45 S. W. 433, 41 L. R. A. 284; *Baskette* v. *Streight,* 106 Tenn. 549, 62 S. W. 142; *State ex rel* v. *West*, 1,39 Tenn. 522, 201 S. W. 743, Ann. Cass. 1918D, 749; *In re Knott*, 138 Tenn. 349, 197 S. W. 1097; *Stubblefield* v. *State ex rel.*, 171 Tenn. 580, 106 S. W. (2d) 558.

■ In other words, in all of these custody or adoption cases involving small children, the rights of the parties, adult parties that is, applying for the custody of these children, must be relegated to the background and subordinated to what is considered for the best interest of the child. The majority of the cases are all, insofar as we have been able to ascertain, based on what is for the best interest of the child. They consider it from the standpoint "in respect to its temporal and its mental and moral welfare." No court so far as we are able to ascertain has ever entertained the idea that the custody of a small child may be awarded solely upon the basis of financial or other material advantages which the respective claimant can give to a child. As is said in 39 American Jurisprudence, page 611, section 22: "The object to be sought for the child is not so much the luxury and social advantages that its more wealthy guardians might be able to give it as the wholesome, intellectual, and moral atmosphere most likely to be found in its natural home, even though it is one of poverty. Thus, a child will not be taken from the custody of its parent merely because a third person, seeking its custody, may have larger means and is able to give it great comforts, wider education, and the promise of a larger inheritance." Or, as

said by this Court *in Re Knott, supra.* ''The mere fact that the petitioners desire to adopt the child and that they are in better financial condition . . . will never authorize a decree of adoption. . . . The relations which exist between the parents and child are sacred ones and have their foundation in nature, and the affection existing between them is stronger and more potent, and affords a greater protection to the child, than any relation which could be created by association merely. The rights to the society of the child exist in its parents; the right to rear it, to its custody, to its tutorage, the shaping of its destiny, and all of the consequences that naturally follow from the relationship are inherently in the natural parents, and they cannot be deprived of these rights without notice, and upon some ground which affects materially the future of the child.'' Page 355 of 138 Tenn., page 1098 of 197 S. W.

◼ Therefore, it is perfectly obvious to us that have given the matter any serious thought and consideration, that mere financial advantage should not be a consideration or the consideration in placing the custody of the child. There are literally thousands of other things that we must take into consideration in the lives of young children. In doing this we must overlook the legal considerations of those seeking the custody or adoption and must view the overall picture from the standpoint of the child's best interest. In considering these interests, we think that the often used expression ''that in respect to its temporal and its mental and moral welfare'' is the consideration that should be given by the courts under a situation involved in the instant lawsuit. The court in acting on these custody or adoption cases is more or less acting in the capacity of *parens patriae* for

the child. *Finlay* v. *Finlay* 240 N. Y. 429, 148 N. E. 624, 40 A. L. R. 937.

It, therefore, seems to us that it is the duty and obligation of the court when the custody of a child is involved to go further than did the Court of Appeals in the instant case. That is, the Court of Appeals apparently is following its statutory obligation under Code 10622, in concluding that its only obligation was to see whether or not the evidence in the particular case preponderated against the finding of the lower court. This rule of course has, long prior to the enactment of the Code Section referred to, been observed by that court by reason of the fact that the chancellor when he hears these cases on oral evidence has the opportunity of considering the witnesses and observing their intelligence and their capacity and their fairness or bias, their manner and characteristics, and he by reason of this observation has the opportunity for judging the value of their testimony and as a result his findings of fact have not, for a long period of time, been disturbed unless there is a manifest weight of the evidence against his finding.

Here though we do not have a chattel or something that can be bandied around or sold or passed title from one party to another; we have a life, a small and young life whose interests must be looked to in growing into fine manhood or womanhood. This being true, it seems to us that when one of these cases comes to the appellate court on appeal, the appellate court has more or less a mixed question of law and fact and it must exercise its judgment under these things in the matter.

Some courts take the position that the awarding of the custody of a child, as in the instant case, is a discre-

tionary matter with the trial court, for obvious reasons. *Mattox* v. *Mattox*, 129 Okl. 301, 264 P. 898. In the exercise of this discretion the trial court does not act arbitrarily or willfully but with regard to what is right and equitable, considering first the child's best interest as directed by his reason and conscience towards the child's welfare.

In view of what we have heretofore said as to the duty of the Court—trial or appellate—in these child custody cases, we are of the opinion that these cases must be reviewed by the appellate Court *de novo*. In thus reviewing the record— the appellate Court reviewing the case *de novo*— that Court will give great weight to the decision of the trial court when that Court saw the witnesses face to face and heard them testify.

''The decision of the trial judge determinative of the custody of a child or the liberty of a citizen cannot be given the force and effect of the verdict of the jury, or upon waiver of the jury the force and effect of the finding of the trial judge as in law causes reviewable only upon motion for a new trial, as in *Railroad Co.* v. *Johnson, supra* [114 Tenn. 632, 88 S. W. 169].'' *State ex rel. Daugherty* v. *Rose*, 167 Tenn. 489, 492, 71 S. W. (2d) 685, 686.

The rule followed by the Court of Appeals—whether or not the evidence preponderates against the decree of the trial court—is entirely too narrow in this type of case. It is for these reasons we are constrained to hold that it is the duty of the Appellate Court to review the record *de novo*. We have so considered the evidence upon which the trial judge acted and are of the opinion that his action was for the best interest of the child involved. For these reasons, we must deny the writ.

It is argued by the petitioner here that to take this child away from these brothers would be of far more harm to him than to leave him with them. They say he would be much better off and would make a much better man if he is allowed to stay with his two brothers (the three children being very near together, only about 13 months between the youngest and middle and the like amount between the middle and older brother). Of course this question is a debatable one and one that the Appellate Court as well as the trial judge should carefully consider in determining what are the best interests of the child involved.

We have arrived at this conclusion because the parents have no absolute legal right to the custody of their child but the consideration is what is for the best interest for the child, not looked at from purely a financial standpoint but considered more from its temporal, moral and mental standpoint, as above indicated.

All concur.