YOUNG *et ux. v.* SMITH *et al.*

(*Knoxville*, September Term, 1951.)

Opinion filed February 9, 1952.

GODDARD & GAMBLE, of Maryville, for plaintiffs.

FRANK L. FLYNN, of Knoxville, for defendant Kathleen Atchley Abeshaheen.

BESS BLAKE, of Nashville, for defendant Department of Public Welfare.

MR. JUSTICE GAILOR delivered the opinion of the Court.

This appeal presents a petition for the adoption of James Patrick Smith, filed by Max Young and his wife, in the County Court of Blount County, against the natural parents of James Patrick Smith. It is the third time that this controversy in one or other of its aspects has been presented to this Court. In an opinion printed in 188 Tenn. 430, 220 S. W. (2d) 627, in the case of *Smith* v. *Smith,* it was decided that on the question of custody of this little boy who was born in 1943, the Court of Appeals should review the record made in the County Court de novo. On the remand, it was decided that Max Young and his wife should have the absolute custody of this little boy.

Time went on, the little boy lived with the Youngs, and on May 20, 1949, they filed this petition for the adoption of the little boy. The natural father filed an answer, agreeing to the adoption. The natural mother resisted it, and the Department of Public Welfare also filed an answer as a party-Defendant. Since the natural mother had refused to agree to the adoption, the County Judge concluded that by a proper construction of Chapter 127, Public Acts of 1949, he was precluded from permitting the adoption. On the appeal from this decree to this Court, we held, in an opinion by the Chief Justice, reported in 191 Tenn. 25, 231 S. W. (2d) 365, 368, that the Act of 1949 did not contemplate "that the present and future life of a child should be left to the arbitrary will and possible caprice of anybody, be it the natural parent or any child-caring agency." After that decision of this Court, on the remand to the County Court, the adoption was granted.

From the decree of adoption, the case was appealed to the Court of Appeals, and that Court, in an excellent and well-worked opinion by Judge Hale, affirmed the County Judge. The natural mother, Mrs. Abeshaheen, and the Department of Public Welfare have filed petitions for certiorari. The petitions both present questions that were considered and determined in the Court of Appeals. We think they were decided correctly by that Court and that the well-considered opinion by Judge Hale should be adopted as the opinion of this Court. It is as follows:

"This is an appeal from the judgment of the County Court of Blount County granting to Max H. Young and wife Magdalene M. Young the adoption of James Patrick Smith (born Oct. 6, 1943), who is the son of the defendant Emerson T. Smith and Kathleen Atchley Smith Abeshaheen. The Smiths were divorced in 1946, and each has

married again. The father filed a sworn answer consenting to the adoption. The mother demurred, insisting that Ch. 127, Public Acts of 1949, required the consent of *both* parents as a condition precedent to the adoption. This was sustained by the lower Court, but upon appeal to the Supreme Court, it was held this statute did not contemplate 'that the present and future life of a child should be left to the arbitrary will and possible caprice of anybody, be it the natural parent or any child-caring agency.' The case was remanded for trial upon the merits. *Young* v. *Smith*, 191 Tenn. 25, 231 S. W. (2d) 365. Upon remand the adoption was granted.

"The mother, Mrs. Abeshaheen, has appealed and assigned errors. The State Department of Public Welfare was also granted an appeal and has assigned errors. We do not find anything in the Act in question, Ch. 127, Public Acts of 1949, giving the aforesaid Department of Public Welfare a justiciable interest in this matter. The Act is captioned:

" 'AN ACT to regulate adoptions in Tennessee; to designate the Courts empowered to hear adoption petitions; to provide who shall consent to an adoption, and the manner in which consent shall be given; *to guarantee a social investigation and supervisory visits to every child adopted;* to establish the relationship conferred through adoption; to provide for confidentiality and sealing of records and confidentiality of proceedings; to establish court fees; to provide for adult adoptions; to prevent unauthorized agencies and persons from engaging in child placement; and to provide penalties for violation of the law.' (Emphasis supplied.)

"The body of this Act provides for a careful investigation and report by the Department in cases of this character, and in section 5, in next to the last sentence,

484

it says: 'If the report of the Department * * * disapproves of the adoption of the child, motion *may* be made to the court to dismiss the petition.' But, as Mr. Chief Justice Neil pointed out in *Young* v. *Smith,* supra, such objection 'merely raises an issue as to the welfare of the child.'

█ "The investigation of skilled social workers may be of great value to the tribunal having the power of adoption, but, under the construction given this statute, does not afford the right to veto the proposed adoption.

"Consequently, we are not considering the assignments of error filed by the Department, but, as the same questions are made in the assignments of error filed by Mrs. Abeshaheen, we are treating the supporting brief of the Department as being filed by a friend of the Court.

"In the opinion in *Young* v. *Smith,* supra, reference is made to, and a quotation is given from the opinion in *Smith* v. *Smith,* 188 Tenn. 430, 220 S. W. (2d) 627, which involved the right of Mr. and Mrs. Young to have the custody of this child. In that case, the Juvenile and Domestic Relations Court of Knox County (Hu B. Webster, Judge) sustained the intervening petition of the Youngs who sought the exclusive custody of this child. On appeal to this Court, it was held the evidence did not preponderate against the decision of the trial court. The case was then removed by certiorari to the Supreme Court, which, speaking through Mr. Justice Burnett, held it was the duty of the appellate court to review the evidence *de novo,* cf. *State* v. *Parker,* 191 Tenn. 564, 235 S. W. (2d) 580; *Cecil* v. *State,* 191 Tenn. 74, 237 S. W. (2d) 558, and it then so reviewed the evidence and held that it was for the best interest of the child that his custody be given the Youngs. This opinion was filed May 6, 1949, and gives a full history of the events.

"On May 20, 1949, Mr. and Mrs. Young filed their petition for adoption herein. The record in the case of *Smith* v. *Smith* (the custody case) was filed in the instant case and shows the Youngs were desirous of adopting this child. The fact that the petition for adoption was filed just two weeks after their right to his custody had been determined by the Supreme Court, is indicative of their good faith.

"But it is urged that the lower court was in error in considering the record and bill of exceptions, in the case of *Smith* v. *Smith,* supra. To this we cannot agree. When an award of custody of a minor is made which has no restriction or limitation, it is a final decree and will support plea of res adjudicata unless there has been such a change in the condition and circumstances of the parties as would justify a petition for a new award of custody. *State ex rel.* v. *West,* 139 Tenn. 522, 201 S. W. 743; *Kenner* v. *Kenner,* 139 Tenn. 211, 201 S. W. 779, L. R. A. 1918E, 587; *Holloway* v. *Bradley,* 190 Tenn. 565, 230 S. W. (2d) 1003; *Cecil* v. *State,* Supra; *Hicks* v. *Hicks,* 26 Tenn. App. 641, 176 S. W. (2d) 371. The evidence adduced in the custody case, *Smith* v. *Smith,* is substantially the same as that presented in the case on appeal. In some respects the latter is stronger in that the Youngs have had the custody of this child for this additional period of litigation, during which they have continued to give him the love and care so highly praised in the opinion in *Smith* v. *Smith,* supra. In addition to this, it is manifest that the longer this child stays with the Youngs the greater would be the difficulty of readjustment. Mr. Young's earning capacity has increased since the trial in the custody case. For the appellant it is shown that she and her husband and the other two boys by her first marriage live happily together and are

in improved financial condition. Certainly, the evidence in the instant case would not authorize a change in the custody awarded in the case of *Smith* v. *Smith*.

"So we think the trial judge properly considered the record and bill of exceptions in such former case.

■ "It is urged that the decree of adoption is not sustained by the evidence. In accordance with the holding in *Smith* v. *Smith*, supra, we have very carefully reviewed the evidence de novo. The Youngs do not have a single blot on their reputation and not one criticism is leveled at their treatment of their foster son. They now have a child of their own and they make no distinction between the two. They are active in church affairs, are sober, industrious, and of the highest character. For nearly five years they have given this child the loving care he was entitled to have received but did not get from his parents. They are the only parents he knows. They love him and he loves them. They have been adjudicated to have rights superior to his parents for his custody. They now want to go a step further and give him all the rights he would have if born to them. Why shouldn't this be done? Is it right to say to this child, we will give your custody to the Youngs but we will not allow you to stand as an heir to their property? Is that for the best interest of the child? If the adoption be not sanctioned, will there be a resumption of the litigation over his custody, to be carried on with the tenacity and determination shown in this and the kindred causes?

"We have deep sympathy for the mother. She and her present husband have her other two boys. They are well housed and cared for—perhaps not as well as that given by the Youngs to James Patrick but adequate. We can understand her desire to have her children together, but

it seems that this has an element of selfishness that overlooks what is best for the child.

"Once there were two women who lived together in the same house. Each bore a son about the same time. One of these babies was overlaid and smothered in the night, and then there arose a dispute between the women as to which was the mother of the living child. The matter was brought to King Solomon for settlement, and he, after hearing the parties, ordered a sword brought to him. Then, the record continues:

" 'And the King said, Divide the living child in two, and give half to the one, and half to the other. Then spake the woman whose the living child was unto the King, for her bowels yearned upon her son, and she said, O my lord, give her the living child, and in no wise slay it. But the other said, Let it be neither mine nor thine, but divide it. Then the King answered and said, Give her the living child, and in no wise slay it; she is the mother thereof.' (I Kings, 3:25-27.)

"The mother in the case at bar is willing to sever this child from the only home he has ever known, to take him away from where he is 'permanently, comfortably and securely located with good, highly respected, Christian people who will love and care for him,' *Smith* v. *Smith*, supra, 188 Tenn. at page 434, 220 S. W. (2d) 627, and is willing for him to run the risk of the readjustment incident to a move of this sort.

"It is not given to us to look into the future, but if the past is a lamp for our path, then we can assert our belief that the Youngs will continue to give this child the same loving care afforded him in the past. We are not willing to gamble his welfare against his mother's wishes.

"But it is argued the trial judge improperly excluded the testimony of Mrs. Valie Smith Miller, a social welfare worker of the Department. Mrs. Miller was called as an expert witness by counsel for the Department. On direct examination she testified that Mrs. Young had said she did not believe the mother cared for this child; that it would be detrimental for a child to grow up with the feeling he was rejected by his own parents; and that she had visited the Abashaheen home and found the other children were well adjusted, happy, and interestd in getting James Patrick back with them. She also visited the Young home and found this child was healthy and happy, and had received adequate and sound training and was doing well in school. The trial judge held this testimony, so far as based upon the actual knowledge of the witness, was admissible, while the other was only advisory. Upon cross-examination by counsel for Mrs. Abeshaheen the following occurred:

" 'From the investigation you made, which consisted of visitation to the homes and interviews with these respective parties, and your reading of the Court record in the custody case, I would like for you to state your opinion what would be for the best interest of this little boy.

"Mr. Gamble: Object.

"The Court: I don't think that it would be proper evidence. I have her report on that.

"Mr. Flynn: Except for the record, I would like for her to answer that question to the stenographer, so it would get into the record.

"The Court: Don't think her recommendation would be admissible as evidence.

"Mr. Flynn: We certainly note an exception.

"What her answer would have been is not shown, but it is apparent from her testimony previously given that it was her opinion the adoption should not be allowed. The 'report' mentioned by the trial judge was made by Mrs. Miller and another representative of the Department, the gist of which is that the adoption should be denied and that Mr. and Mrs. Young should voluntarily relinquish custody of this child to his mother. As we understand the record, this was considered by the trial judge, and, altho sent up in a sealed enevelope it was opened and considered by us. Courts of Star Chamber have long since passed into oblivion. In Sunderland's Judicial Administration, p. 14, it is said of that court:

" 'An accused person brought before it on oral charges knew neither the accuser nor the crime of which he was accused; when proceeded against by bill he was examined on written interrogatories, and witnesses against him were questioned in private. Its punishments were arbitrary and severe, though they did not include sentence of death; torture was a regular means for extorting confessions. Crimes of every kind large and small, both ordinary infractions of the law and political offenses were within the range of its activity. It exerted influence on the law courts by withdrawing to itself cases in which they were about to pronounce judgment; it summoned before it juries from these courts, to account for their verdicts, and fined and imprisoned them if their views failed to coincide with those of the Star Chamber.

" 'It is clear that this court became chiefly a judicial weapon designed to support the political tyranny of the Crown. As such its fortunes followed those of the monarch. The first act of the Long Parliament, 16 Car. I. cap. 10 (A. D. 1641) was to abolish the Star Chamber.'

490 

██ "If courts are to remain open, and if our law is not to judge any man before it hears him, it must follow that any matter which has any evidential value must be submitted through the orderly processes of the court and available to the litigants and their counsel. Consequently, these recommendations should have been received openly, and considered for whatever they might be worth in light of the testimony in the case. But we cannot follow them. The Youngs are not willing to relinquish the custody of this child to the mother which seemed to be a condition precedent to the recommendation of these welfare workers.

"In our opinion, after a careful study of the record, it is to the great and manifest interest of this minor to approve his adoption by the Youngs so that their right to his custody may ripen into a full relation of parent and child."

Writ denied.