IN THE COURT OF APPEALS OF TENNESSEE
AT KNOXVILLE
December 7, 2011 Session

**SHANNON WAYNE BROWN v. LISA DENISE BROWN (CHURCH)**

**Appeal from the Probate & Family Court for Cumberland County**
**No. 2008 PF-298     Larry Michael Warner, Judge**

_____

**No. E2011-00421-COA-R3-CV-FILED-APRIL 13, 2012**

_____

This post-divorce appeal arises from an action to modify the parties' marital dissolution agreement, permanent parenting plan, and to award child support. The permanent parenting plan provided that the father's child support obligation would not become effective until certain real property was sold; however, because the property had not been sold, the father never started making child support payments. Several hearings were conducted; at the final one, the mother also sought permission to move out-of-state with the minor children. The trial court denied the relief sought by the mother. The father was named the primary residential parent, and the mother was ordered to pay child support. The mother appeals. We affirm.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Probate & Family Court Affirmed; Case Remanded**

JOHN W. MCCLARTY, J., delivered the opinion of the Court, in which CHARLES D. SUSANO, JR., and D. MICHAEL SWINEY, JJ., joined.

William A. Cameron, Cookeville, Tennessee, for the appellant, Lisa Denise Brown (Church).

Brett A. York, Crossville, Tennessee, for the appellee, Shannon Wayne Brown.

**OPINION**

**I.  BACKGROUND**

The parties, Shannon Wayne Brown ("Husband") and Lisa Patrick Brown (Church) ("Wife"), were married on May 30, 1992, and remained married for 16 years. They had three children together and resided during the marriage in Crossville, Tennessee, owning several

properties. Husband filed for divorce based on irreconcilable differences in March 2008.

The parties entered into a Marital Dissolution Agreement ("MDA") and Permanent Parenting Plan ("Plan I") on July 16, 2008. Plan I provided that the children would reside with Wife 213 days and that she would be the primary residential parent; Husband would receive 152 days of visitation. Plan I indicated that the child support worksheet was to be attached as an exhibit, but it was not included and there was no calculation on what child support would have been had it been included.

The MDA divided the real property of the parties as follows: Husband and Wife agreed to become tenants in common in regard to the marital residence, which was located on Peavine Firetower Road ("Otter Pointe") in Crossville. Wife was to live there, and she was to be responsible for paying the utilities and one-half of the mortgage (that one-half being interest only), as well as maintenance on the property. The parties agreed to sell the home, but in the event it was not sold within six months, Husband had the option of selling it at auction. As to their property on Magnolia Lane in Crossville, the parties were to become tenants in common, with Husband responsible for paying the mortgage on the property until the sale of the home. In the event that the residence was not sold within six months, Husband had the option to sell it at auction. In regard to the sale of both residences, Husband and Wife agreed that the proceeds from the sale of these homes would go first toward any realtor fees and costs associated with the sale of the homes, any outstanding mortgages, homeowner's insurance, and taxes. After the sale of both homes, Husband was to pay Wife the sum of $25,000. As to the interest the parties had in a spec house in Deer Creek Subdivision in Crossville, Husband and Wife agreed to each receive one-half of the proceeds from the sale of the home. All the remaining proceeds from the sale of the houses was to be equally divided among the parties. The parties also agreed in the MDA that Husband would purchase a new car for Wife, not to exceed $40,000, after the sale of the first home. Husband was to retain all the other vehicles, including boats, golf carts, and motorcycles, and be responsible for the indebtedness thereon. The parties also agreed that Husband's interest in the company Cumberland Components, Inc., would become his sole and separate property.

Husband and Wife were awarded an absolute divorce on August 11, 2008. In the final decree, no amount of child support was set.

Wife subsequently filed a petition to set child support. In her petition, Wife noted that according to Plan I, Husband's gross monthly income equaled $5,000, while her gross monthly income equaled $3,209. She also petitioned to sell the real property at auction. Wife acknowledged that she had agreed Husband would not have to pay child support until after the sale of the real property was completed:

Q. And under the Parenting Plan, is there any, any specific provisions for child support?

A. None.

Q. When you signed the Final Decree, what was your understanding of what the child support would be?

A. Child support would not begin until both homes were sold. Which, a verbal agreement, when we signed, was that they would be auctioned within six months.

She stressed that she was due a total of $90,000 in alimony.

Husband contended that as of August 2010, he had paid to and for the benefit of Wife approximately $70,000. He also filed a counterclaim averring that it would be in the best interest of the children to abandon Plan I and make him primary residential parent instead of Wife. Husband asserted that a significant and material change of circumstances had occurred – that Wife was constantly interfering with his parenting time and had been wholly unstable as it relates to the minor children.

At the August hearing, the parties reached an agreement as to parenting, announced by counsel for Husband:

MR. YORK: Judge, if it please the Court, at least on a portion of this we've got a resolution, subject to Your Honor's approval, certainly. If it please the Court, the parties have agreed that the best interest of the minor children would be served by enjoining in joint and equal primary parenting time, joint and equal custody, using that language. It will be joint and equal time . . . .

The parties also announced that Wife would receive real property located at Arrowhead Drive in Crossville, and Husband would take the Otter Pointe property. The court determined that Wife was voluntarily underemployed and imputed $40,000 per year income to her. An interlocutory order along with a new permanent parenting plan ("Plan II") was filed on September 10, 2010, in which the parties received joint and equal parenting time and both were designated as the primary residential parents. Again, no child support was set.

Approximately three months later, Wife petitioned the court to resolve issues she claimed had not been addressed by either the final decree or the interlocutory order. She also requested to move out-of-state with the children and proposed certain changes to Plan II in

-3-

order to keep the joint custody agreement.[1]  Wife contended that the shared residential parenting time ordered in Plan II could be accomplished if the children resided with her during the school year and spent all school breaks and holidays with Husband.

Wife also sought payment for half of the proceeds from the sale of a home in Spring City, claiming that she had not received her portion from Husband after the sale.  According to Wife, Husband had used the proceeds from the sale ($30,000) to pay off the debt on a Supra ski boat.  Thus, she asserted that Husband owed her $15,000.  Wife further contended that Husband had sold/traded the home on Magnolia Lane,[2] thereby gaining a $17,000 profit, but that he had not provided half of the proceeds to her.  She also averred that Husband still had not paid the $90,000 in alimony he owed her.

Wife additionally asserted that Husband had fraudulently induced her to enter into the MDA by not fully disclosing the value of his business.  Wife claimed that Husband had convinced her that there was no interest in Cumberland Components, Inc., that it had a negative value, and that it was about to close its doors any day.  She argued that she should be awarded her fair share of the true equity in the business pursuant to Rule 60.02 of the Tennessee Rules of Civil Procedure.  Wife also related that Husband's claimed gross monthly income of $5,000 is substantially less than what he actually takes home from Cumberland Components, Inc.

Furthermore, Wife argued that because the issue of child support had been left open, there was no final and complete binding judgment.  Related to this assertion, she petitioned the trial court to allow her to hire an expert to determine the actual income Husband was incurring in order to accurately calculate and retroactively apply the child support.  Wife also asserted that although she was supposed to pay the taxes and interest on her property, Husband had claimed the tax deductions.  She further contended that because her home had not been sold by Husband as he had promised, she was required to pay substantially more

---

[1]Wife wanted to move to Maryland where her new fiancé resided.  She stated that she would be able to find work there.

[2]At the August 2010 hearing, Wife testified as follows:

A. . . . [H]e told me, that if I would sign the agreement to allow him to trade the home, that he would pay me ten thousand dollars ($10,000.00) toward alimony, and would start paying child support.

Q.  And did he start paying child support?

A.  He paid for one month.

-4-

each month for mortgage payments. Thus, Wife requested that she be reimbursed for the losses she had incurred due to the loss of the tax deductions and increased mortgage payments.

Husband responded that the money claimed by Wife had been paid toward the mortgage payment on the Otter Pointe home, in which she had been living at the time. Further, he denied that Wife had paid any property taxes, and asserted that she had not made any of the payments due on the property that was granted to her pursuant to the interlocutory order.

Another hearing was held in December 2010. After listening to the arguments of the parties, the trial court denied (1) Wife's request to revisit the final decree and set aside portions of the MDA, (2) her Rule 60.02 motion regarding the alleged fraudulent and incomplete disclosure by Husband of the value of his business and his gross monthly income, (3) her motion regarding half the proceeds from the sale of the house on Magnolia Lane, and (4) her proposal to modify Plan II. The court found that Husband had paid a total of $84,340.04 toward expenses for the benefit of Wife and gave him credit for that amount toward the $90,000 in alimony owed; Wife was awarded a judgment for the remaining amount ($5,659.96). Most significantly, the trial court denied Wife's motion to relocate with the children out-of-state, and modified the existing parenting plan (Plan II) to name Husband as primary residential parent. Wife was awarded 80 days of visitation with the children, with any transportation costs related to the minor children her responsibility due to her move to Maryland.

The court further observed that Husband would have owed $8,529 in retroactive child support from the date of the divorce in August 2008 through the hearing in August 2010. That amount was credited toward the child support obligation the court placed on Wife as a result of the modification to Plan II. Wife will begin paying child support to Husband once Husband's arrearage is credited in full.

Wife perfected a timely appeal.

## II. ISSUES

Wife presents the following issues on appeal, which we restate as follows:

1. Was Wife's half interest in the realty in Spring City improperly used to pay Husband's debt on a Supra ski boat retained by Husband in the initial asset allocation between the parties?

2. Should Wife have been denied joint custody of her children when there was no material change in circumstances other than her move out-of-state after a re-marriage?

3. Was the original decree of divorce a final judgment when it reserved child support to be set at a later time?

4. Was Wife entitled to half of the profit from the sale of the Magnolia Lane home?

5. Was Wife entitled to the $90,000 in alimony without setoff for Husband's expenses?

6. Was Wife entitled to proceed under a Rule 60.02 Motion on fraud since the original decree was not a final order due to certain issues not being resolved in the final order?

7. Was Wife entitled to an interest deduction on her taxes?

## III. STANDARD OF REVIEW

Our review is de novo upon the record, accompanied by a presumption of the correctness of the findings of fact of the trial court, unless the preponderance of the evidence is otherwise. Tennessee Rules of Appellate Procedure 13(d); *Davis v. Inman*, 974 S.W.2d 689, 692 (Tenn. 1998). The trial court's conclusions of law are subject to a de novo review with no presumption of correctness. *Morrison v. Allen*, 228 S.W.3d 417, 425 (Tenn. 2011).

In matters of divorce and child custody, trial courts are vested with broad discretion, and appellate courts will not interfere with the trial court's decision except upon a showing of erroneous exercise of that discretion. *See Whitaker v. Whitaker*, 957 S.W.2d 834, 836-37 (Tenn. Ct. App. 1997). Because "[c]ustody and visitation determinations often hinge on subtle factors, including the parents' demeanor and credibility during . . . proceedings," appellate courts "are reluctant to second-guess a trial court's decisions." *Hyde v. Amanda Bradley*, No. M2009-02117-COA-R3-JV, 2010 WL 4024905, at *3 (Tenn. Ct. App. Oct. 12, 2010) (citing *Johnson v. Johnson*, 169 S.W.3d 640, 645 (Tenn. Ct. App. 2004)).

## IV. DISCUSSION

### A.

It appears that before drawing up the MDA, the parties agreed that the Spring City home would be sold and the proceeds divided equally. Wife contends that after the divorce and sale of the

-6-

home, Husband improperly used the proceeds to pay off a debt that was owed on a Supra ski boat. She asserts that she is entitled to half of the proceeds as marital property. Husband claims that the home was sold in May 2008, while the parties were still married and prior to the filing of the divorce action and the MDA.

We find no evidence of record to support the contention of Wife. Accordingly, the issue is denied.

## B.

### 1. Custody

"A custody decision, once final, is res judicata upon the facts in existence or reasonably foreseeable when the decision was made." *Scofield v. Scofield*, No. M2006-00350-COA-R3-CV, 2007 WL 624351, at *3 (Tenn. Ct. App. Feb. 28, 2007) (citing *Young v. Smith*, 246 S.W.2d 93, 95 (Tenn. 1952)). However, because the circumstances of children and parents change, our courts are "empowered to alter custody arrangements when intervening circumstances require modifications." *Scofield*, 2007 WL 624351, at *2 (citing Tenn. Code Ann. § 36-6-101(a)(1)).

Modification of an existing custody or visitation arrangement involves a two-step analysis. Tenn. Code Ann. § 36-6-101(a)(2)(B)-(C). First, the parent attempting to modify the existing custody or visitation arrangement must prove that a material change in circumstances has occurred. Tenn. Code Ann. § 36-6-101(a)(2)(B)-(C). "There are no hard and fast rules for when there has been a change of circumstances sufficient to justify a change in custody." *Cosner v. Cosner*, No. E2007-02031-COA-R3-CV, 2008 WL 3892024, at *4 (Tenn. Ct. App. Aug. 22, 2008) (citing *Cranston v. Combs*, 106 S.W.3d 641, 644 (Tenn. 2003)). However, to determine whether a material change in circumstances has occurred, the court should consider whether: "(1) the change occurred after the entry of the order sought to be modified; (2) the changed circumstances were not reasonably anticipated when the underlying decree was entered; and (3) the change is one that affects the child's well-being in a meaningful way." *Cosner*, 2008 WL 3892024, at *4 (citing *Kendrick v. Shoemake*, 90 S.W.3d 566, 570 (Tenn. 2002)).

The determination of whether a "material change of circumstances" has occurred requires a different standard depending upon whether a parent is seeking to modify custody (i.e., change the primary residential parent) or modify the residential parenting schedule. Tenn. Code Ann. § 36-6-101(a)(2)(B)-(C). "[A] 'change in circumstance' with regard to the parenting schedule is a distinct concept from a 'change in circumstance' with regard to the identity of the primary residential parent." *Massey-Holt v. Holt*, 255 S.W.3d 603, 607 (Tenn. Ct. App. 2007). Subsection (a)(2)(C) establishes a lower threshold for modification of a residential parenting schedule. *Scofield*, 2007 WL 624351, at *3.

In pertinent part, Tennessee Code Annotated section 36-6-101(a)(2)(B)-(C) provides:

(B) If the issue before the court is a modification of the court's prior decree pertaining to custody, the petitioner must prove by a preponderance of the evidence a material change in circumstance. A material change of circumstance does not require a showing of a substantial risk of harm to the child. A material change of circumstance may include, but is not limited to, failures to adhere to the parenting plan or an order of custody and visitation or circumstances that make the parenting plan no longer in the best interest of the child.

* * *

(C) If the issue before the court is a modification of the court's prior decree pertaining to a residential parenting schedule, then the petitioner must prove by a preponderance of the evidence a material change of circumstance affecting the child's best interest. A material change of circumstance does not require a showing of a substantial risk of harm to the child. A material change of circumstance for purposes of modification of a residential parenting schedule may include, but is not limited to, significant changes in the needs of the child over time, which may include changes relating to age; significant changes in the parent's living or working condition that significantly affect parenting; failure to adhere to the parenting plan; or other circumstances making a change in the residential parenting time in the best interest of the child.

Tenn. Code Ann. § 36-6-101(a)(2)(B)-(C) (2010). If the petitioner makes a prima facie case for a material change in circumstances, then the court must determine whether a change in custody or visitation is in the best interest of the child. *In re J.C.S.*, No. M2007-02049-COA-R3-PT, 2008 WL 2924982, at *6 (Tenn. Ct. App. July 28, 2008). The pertinent issue before us is the trial court's determination of the primary residential parent. This determination requires consideration of a number of factors, including those set forth at Tennessee Code Annotated section 36-6-106(a) to make an initial custody determination:

(1) The love, affection and emotional ties existing between the parents . . . and the child;

(2) The disposition of the parents . . . to provide the child with food, clothing, medical care, education and other necessary care and the degree to which a parent . . . has been the primary caregiver;

(3) The importance of continuity in the child's life and the length of time the child has lived in a stable, satisfactory environment . . . ;

(4) The stability of the family unit of the parents . . . ;

(5) The mental and physical health of the parents . . . ;

(6)  The home, school and community record of the child;

(7)(A)  The reasonable preference of the child, if twelve (12) years of age or older;
(B) The court may hear the preference of a younger child on request.  The preferences
of older children should normally be given greater weight than those of younger
children;

(8)  Evidence of physical or emotional abuse to the child, to the other parent or to any
other person . . . ;

(9)  The character and behavior of any other person who resides in or frequents the
home of a parent . . . and the person's interactions with the child; and

(10)  Each parent's . . . past and potential for future performance of parenting
responsibilities, including the willingness and ability of each of the parents . . . to
facilitate and encourage a close and continuing parent-child relationship between the
child and both of the child's parents, consistent with the best interest of the child. .
. .

Tenn. Code Ann. § 36-6-106(a) (2010).

When Plan II was put in place, it designated both parents as the primary residential parents.
Tennessee Code Annotated section 36-6-402(5) declares that the residential schedule must include
the designation of a primary residential parent.  Tennessee Code Annotated section 36-6-402(4)
defines the primary residential parent as "the parent with whom the child resides more than fifty
percent (50%) of the time."  If the children were dividing their time equally between the parents,
neither parent meets the statutory definition of a primary residential parent.  However, Tennessee
Code Annotated section 36-6-410 declares that the designation of a primary custodian is necessary
for all state and federal statutes and applicable policies of insurance which require a determination
of custody.  Thus, ". . . even though there may be no primary residential parent in fact, the law
requires the designation of one parent as the primary residential parent, regardless of the statutory
definition." *Cummings v. Cummings*, M2003-00086-COA-R3-CV, 2004 WL 2346000 (Tenn. Ct.
App. Oct. 15, 2004).  *See also Hopkins v. Hopkins*, 152 S.W.3d 447, 450 (Tenn. 2004).

The trial court's designation in Plan II of both parents as the primary residential parent did
not comply with the requirement that **one** parent be named the primary residential parent.  The trial
court must designate that role to only one of the parents; however, the designation does not
necessarily require the alternation of the equal division of parenting time.  *Estes v. Estes*, No.
M2010-02554-COA-R3-CV, 2011 WL 4729862, at *8 (Tenn. Ct. App. Oct. 7, 2011).

In the instant case, the trial court determined that naming Husband primary residential parent
was in the children's best interest.  The court did not articulate each of the factors and their
application to the facts at issue as set out in Tennessee Code Annotated section 36-6-106(a), but

such is not required. *See Murray v. Murray*, No. M2009-01576-COA-R3-CV, 2010 WL 3852218, at *8 (Tenn. Ct. App. Sept. 28, 2010).

As noted in the statute, "[a] material change of circumstance may include . . . circumstances that make the parenting plan no longer in the best interest of the child." Tenn. Code Ann. § 36-6-101(a)(2)(B). The "best interest of the child" criteria that are relevant to the issue before us are Tennessee Code Annotated section 36-6-106(a)(3) ("[t]he importance of continuity in the child[ren]'s life and the length of time the child[ren] ha[ve] lived in a stable, satisfactory environment"); (4) ("[t]he stability of the family unit of the parents . . . ."); and (7) ("[t]he reasonable preference of the child, if twelve (12) years of age or older; . . . The court may hear the preference of a younger child on request. The preferences of older children should normally be given greater weight than those of younger children").[3] The children in this matter had lived their whole lives in Tennessee and had a stable support system of relatives in the Crossville area. They have no ties to the State of Maryland and barely knew Wife's new husband and his family. The trial court interviewed the children in camera, where they expressed their desire to remain in Tennessee. The record reveals that while Wife informed the trial court in August 2010 that she had no intention or plans to marry or move out-of-state, within three months, she became engaged and filed a petition to move the children to Maryland. We find that a preponderance of the evidence in the record supports the trial court's determination that a material change of circumstance occurred that merited a change of custody to designate Husband as the primary residential parent.

## 2. Relocation

The relocation issue is governed by Tennessee Code Annotated section 36-6-108, which provides, in relevant part in subsection (c), as follows:

(c) If the parents are actually spending substantially equal intervals of time with the child and the relocating parent seeks to move with the child, the other parent may, within thirty (30) days of receipt of notice, file a petition in opposition to removal of the child. No presumption in favor of or against the request to relocate with the child shall arise. The court shall determine whether or not to permit relocation of the child based upon the best interests of the child. The court shall consider all relevant factors including the following where applicable:

(1) The extent to which visitation rights have been allowed and exercised;

(2) Whether the primary residential parent, once out of the jurisdiction, is likely to comply with any new visitation arrangement;

(3) The love, affection and emotional ties existing between the parents and child;

---

[3]At the time of the December 2010 hearing, the children were 12, 11, and 8.

(4)  The disposition of the parents to provide the child with food, clothing, medical care, education and other necessary care and the degree to which a parent has been the primary caregiver;

(5)  The importance of continuity in the child's life and the length of time the child has lived in a stable, satisfactory environment;

(6)  The stability of the family unit of the parents;

(7)  The mental and physical health of the parents;

(8)  The home, school and community record of the child;

(9) (A)  The reasonable preference of the child if twelve (12) years of age or older; (B)  The court may hear the preference of a younger child upon request.  The preferences of older children should normally be given greater weight than those of younger children;

(10)  Evidence of physical or emotional abuse to the child, to the other parent or to any other person; and

(11)  The character and behavior of any other person who resides in or frequents the home of a parent and such person's interactions with the child. . . .

Tenn. Code Ann. § 36-6-108(c) (2010).  Although Wife had been the primary residential parent initially, at the time she sought to move with the children out-of-state, the parties had agreed in Plan II upon spending essentially equal amounts of time with the children.  Thus, the trial court was required to decide the issue on the basis of the best interest of the children.

As we determined in the primary residential parent issue, the relevant "best interest of the child" criteria are Tennessee Code Annotated section 36-6-108(c)(5) ("[t]he importance of continuity in the child[ren]'s life and the length of time the child[ren] ha[ve] lived in a stable, satisfactory environment");  (6) ("[t]he stability of the family unit of the parents"); and (9) ("[t]he reasonable preference of the child, if twelve (12) years of age or older; . . .  The court may hear the preference of a younger child on request.  The preferences of older children should normally be given greater weight than those of younger children").  The children had lived their whole lives in Tennessee and had a stable support system of relatives in the Crossville area.  They have no ties to the State of Maryland and barely knew Wife's new husband and his family.  Upon the trial court interviewing the children in camera, they expressed their desire to remain in Tennessee.  The evidence of record supports a finding that this unanticipated move to another state would affect the "well-being [of the children] in a meaningful way." *Kendrick v. Shoemake*, 90 S.W.3d 566, 570 (Tenn. 2002).  Additionally, in that we have determined that the trial court properly determined that Husband should be the primary residential parent, we find the cases cited by Wife concerning a custodial

parent leaving the state are not persuasive. Accordingly, we find that a preponderance of the evidence supports the trial court's determination that the best interest of the children was served by denying Wife the right to relocate the children. The trial court did not err in its application of the parental relocation statute.

## C.

Husband asserts the issue regarding whether the original decree is a final judgment is now moot as a result of the trial court specifically granting Wife the back child support owed to her from the date of divorce in August 2008 through August 2010 in the amount of $8,529. The trial court also set Wife's child support obligation pursuant to the Child Support Guidelines ("Guidelines") due to the modification of Plan II.

This case is similar to *Flatt v. Flatt*, No. W2007-01376-COA-R3-CV, 2008 WL 794521 (Tenn. Ct. App. Mar. 27, 2008). In that case, the parties had minor children, but did not set child support in their marital dissolution agreement. Almost identical to the current case, the parties in *Flatt* agreed to pay off several marital debts before any child support would be paid, and there was no indication under the Guidelines of even an amount the father would be paying once those debts were paid. In *Flatt*, we noted as follows:

> Tennessee Code Annotated section 36-6-404(a) provides that every final decree for divorce involving a minor child must incorporate a permanent parenting plan. In addition, Tennessee Code Annotated section 36-5-101(j) (formerly subsection (h)) specifically provides that the parties' agreement as to child support may be affirmed, ratified, and incorporated into the divorce decree. This statute contemplates that the child support agreement will be: (1) written, (2) approved by the court, (3) incorporated into a court order, and (4) contain an acknowledgment by the parties that they may not alter the agreement without court approval. *Berryhill v. Rhodes*, 21 S.W.3d 188, 191 (Tenn. 2000). However, a child's right to support cannot be bargained away by a parent to the child's detriment. *Id.* For example, we have previously held that a marital dissolution agreement providing that the mother "waives any and all child support payments which would be due and owing" was void as against the public policy of this state. *Witt v. Witt*, 929 S.W.2d 360, 361 (Tenn. Ct. App. 1996). Similarly, an agreement that one parent would not seek child support if the other would not seek alimony has been declared void. *King v. King*, No. M2001-00275-COA-R3-CV, 2001 WL 1589131, at *4 (Tenn. Ct. App. Dec. 13, 2001). In another case, we refused to enforce an agreed order that stated, "Due to the parties current economic situation, child support shall not be ordered and the state guidelines shall not apply," and we affirmed the trial court's award of retroactive child support. *State ex rel. Wrzesniewski v. Miller*, 77 S.W.3d 195, 196 (Tenn. Ct. App. 2001). "While a child support payment goes, directly or indirectly, to the custodial parent or guardian of a child, the purpose of the payment is to fulfill the

non-custodial parent's obligation to contribute to the child's support." *Rutledge v. Barrett*, 802 S.W.2d 604, 607 (Tenn. 1991) (citing *Hester v. Hester*, 59 Tenn. App. 613, 620, 443 S.W.2d 28, 31 (1968)).

*Flatt*, 2008 WL 794521, at *6.

When reviewing agreements by parties, a trial court must use the Guidelines to review the adequacy of the child support provision. *Berryhill*, 21 S.W.3d at 191, n. 7. The Guidelines, when properly applied, create a rebuttable presumption of the proper award of child support. *Taylor v. Fezell*, 158 S.W.3d 352, 357 (Tenn. 2005). Tennessee Code Annotated section 36-5-101(e)(1)(A) provides:

> If the court finds that evidence is sufficient to rebut this presumption, the court shall make a written finding that the application of the child support guidelines would be unjust or inappropriate in that particular case, in order to provide for the best interest of the child(ren) or the equity between the parties. Findings that the application of the guidelines would be unjust or inappropriate shall state the amount of support that would have been ordered under the child support guidelines and a justification for the variance from the guidelines.

Tenn. Code Ann. § 36-5-101(e)(1)(A) (2010). "These findings must be contained in the trial court's order in addition to the amount of child support that would have been required under the guidelines and the reason for the deviation from this amount." In the absence of such findings, the Guidelines are mandatory. *Flatt*, 2008 WL 794521, at *6 (citations omitted).

The court in *Flatt* noted that when executing their parenting plan, the parties "could not simply relieve Father from paying any child support until the parties could sell one of their real properties." *Id.* at *7. We found that "this arrangement constituted an impermissible 'bargaining away' of the children's right to support from Father, and . . . the agreement was void." *Id.*

We have previously held in *State ex rel. Buckner v. Buckner*, No. E2000-00959-COA-R3-CV, 2000 WL 1207196, at *3 (Tenn. Ct. App. Aug. 24, 2000), that a parent's payments directly to a mortgage holder should not be considered as child support. *See also McDowell v. McDowell*, 586 S.W.2d 110, 112 (Tenn. 1979) ("We think it improper to make a child support award by decreeing that a parent will assume a bank debt of the custodial parent."). Other cases show that a parent simply cannot bargain away a child's right to support. *Berryhill v. Rhodes*, 21 S.W.3d 188 (Tenn. 2000) (quoting *Davis v. Office of Child Support Enforcement*, 908 S.W.2d 649, 651 (1995)). When a private agreement does circumvent the child support guidelines for parent obligations, it is void as against public policy. *Witt v. Witt*, 929 S.W.2d 360, 363 (Tenn. Ct. App. 1996).

The *Flatt* court held that because the final order did not include an effective permanent parenting plan by not naming a primary residential parent, not setting child support, and not stating sufficient reasons for deviating from the Guidelines, the case must be remanded for entry of a valid

permanent parenting plan and for a determination of child support owed by the father from the date of the divorce. In *Flatt*, we noted as follows:

> In this case, Father was relieved of his child support obligation for an indefinite period of time. As noted in *Berryhill*, when the trial court approves and incorporates an agreement as to child support, the trial court must use the Guidelines to review the adequacy of the child support provision. 21 S.W.3d at 191. Any deviation from the Guidelines must be explicitly stated on the record. *State ex rel. Wrzesniewski v. Miller*, 77 S.W.3d 195, 197 (Tenn. Ct. App. 2001). In this case, there is nothing in the record to suggest what Father's child support obligation would have been pursuant to the Child Support Guidelines. In fact, there are no calculations in the record regarding child support, or even an indication as to what type of occupation and income each parent had. There are no "written or specific" reasons listed in the divorce decree as to why application of the Child Support Guidelines would have been unjust or inappropriate" in this particular case, or how this child support provision actually served the children's best interests. The divorce decree merely stated that the parenting plan was approved, "the same effectuating the best interest and welfare of said three minor children." However, the permanent parenting plan, by its terms, would not take effect until the Post Office Road Residence was sold. As previously mentioned, every final decree for divorce involving a minor child must incorporate a permanent parenting plan, and every permanent parenting plan must assign a primary residential parent. *Gray* [*v. Gray*], 78 S.W.3d [881, ] 883 [(Tenn. 2002)] (citing Tenn. Code Ann. §§ 36-6-402(5), 36-6-404(a)). Even when residential time is divided equally between the parents, the parenting plan must designate one parent as the primary residential parent. *Id.* The naming of a primary residential parent controls the issue of child support, and such designation is also necessary to comply with state and federal statutes, *Hopkins* [*v. Hopkins*], 152 S.W.3d [447, ]450, n. 3 [(Tenn. 2004)]. In this case, the divorce decree did state that it incorporated a "permanent parenting plan," but by the parenting plan's own terms, it would not "commence" until the occurrence of a future event. In effect, then, there was no permanent parenting plan in existence for over three years following the divorce. The result was that there was no primary residential parent designated, as required by statute, and there was no child support obligation in effect. **We find that the provisions of the divorce decree provided for a "permanent parenting plan" that was not effective, and allowing Father to avoid his child support obligation indefinitely, are void.**
>
> Because the final order did not include an effective permanent parenting plan, it did not name a primary residential parent, it did not set child support, and it did not state sufficient reasons for deviating from the Child Support Guidelines, we find that this case must be reversed and remanded. We remand the case for entry of a valid permanent parenting plan and for a determination, pursuant to Tennessee Code Annotated section 36-5-101, of child support owed by Father under the Child

Support Guidelines from the date of divorce until Father began paying child support to the Child Support Receipting Unit. If the court finds it appropriate to deviate from the presumptive amount under the Child Support Guidelines, it should make findings of fact justifying its conclusion.

*Flatt*, 2008 WL 794521, at *8 (footnote omitted) (emphasis added).

In the case at bar, Plan I of July 16, 2008, and Plan II of September 10, 2010, are both completely silent on the issue of child support. In *Flatt*, when the documents did not state the child support obligation, the court remanded the case for entry of a valid parenting plan and to resolve the child support.

In our view, similar to the situation found in *Flatt*, a final judgment was lacking in this matter. However, now that the trial court has granted Wife credit for the back child support to which she was entitled and entered a child support award accompanied by the required paperwork, the error has been rectified. As to Wife's assertion that the salaries indicated for the parties are not correct, we find that she has presented no evidence in this record to contradict the findings of the trial court. Accordingly, the preponderance of the evidence supports the determination of the trial court as to this issue.

### D.

Pursuant to the MDA, the Magnolia Lane home was to be sold and the proceeds divided equally between the parties. Wife alleges that the sale of the residence brought substantially more than was expected; she contends that the total income after expenses was $17,252.86 and that she is entitled to one-half ($8,626.43).

Husband asserts in his brief that during a recess at the December hearing, it was explained to Wife that $7,000 of the money received went to closing costs and that the remaining $10,000 went to Wife. According to Husband, he received nothing from the sale of the property. He contends the issue was not submitted to the trial court because it was resolved during the recess.

Upon our review of the record, we find no evidence to support the contention of Wife. Accordingly, the issue is denied.

### E.

It was admitted in the pleadings and in court that Husband agreed to pay Wife $25,000 upon the sale of certain realty. Husband also agreed to buy Wife a vehicle worth up to $40,000. The total amount of alimony owed by Husband was $90,000. Husband alleged, and the court found, that $84,340.04 had been paid by Husband on Wife's debts. Wife argues that this court should remand

this issue back to the trial court with instructions to require receipts so there can be an accounting of the amounts Husband can properly claim. Wife disputes the contentions of Husband that he paid her bills.

According to Husband, Wife failed to fulfill her obligations relative to the payment of certain expenses, resulting in Husband having to pay for the upkeep and maintenance of the properties for the benefit of Wife. Husband asserts he is entitled to the offset as ordered by the trial court. The trial court determined that Husband had paid $84,340.04 in expenses on behalf of Wife that were her obligation under the MDA. Thus, Wife was entitled to a judgment for the remaining $5,659.96. It was admitted by Wife that she had failed to pay these expenses/mortgages that were clearly her obligation under the MDA. We find no evidence of record to support the contention of Wife. Thus, the evidence supports the determination of the trial court.

**F.**

The MDA states that "If either party is found to have concealed any property, materially misrepresented the value of any property, or otherwise defrauded the other party, the entire agreement will be subject to cancellation at the option of the injured party." Since this agreement was a contract, the parties have a limitation of six years by which to bring a claim for fraud or misrepresentation.

In Wife's petition to the trial court, she raised a motion under Rule 60.02 of the Rules of Civil Procedure alleging Husband's misrepresentation of the value of his business. Although Rule 60.02 states that any motion brought under this rule on the basis of fraud or misrepresentation be brought no later than one year from the date of the final order, Wife avers, and we have concluded, that the final order filed on August 18, 2008, was not, in fact, a final order due to the fact that no determination of child support was made.

Because the final decree incorporated the MDA and the MDA included the provision relative to fraud, Wife asserts the trial court should have considered whether the original findings about the business of Cumberland Components, Inc. was induced by fraud. According to Wife, as of July 28, 2010, the company had a value of $875,000, based on the sworn statement by Husband "under penalty for making false statements or over-valuing property to influence the action of any FDIC-insured bank, the undersigned certifies that the information contained in this statement is true and correct."

Husband asserts in his brief that the trial court rejected Wife's assertion that he had been untruthful as to the value of his business. Husband also contends that Wife acted as the accountant for the business and knew its value better than he did. He further notes that the trial court found that Wife and/or her attorney prepared all the documents in this action, with Husband merely agreeing to Wife's terms.

While we agree with Wife that there was no final order in this matter until December 2010, we find no evidence of record to support the assertions of Wife as to the improper valuation of Husband's company or that she was fraudulently induced to sign the MDA. Accordingly, the issue is denied.

## G.

Under the trial court's decree in the case, Wife contends that she was deprived by Husband of tax deductions that would have otherwise been available to her. She asserts Husband was given a credit against his alimony for payments he made toward her property taxes, mortgage interest, and other expenses he can deduct from his income taxes.

The record reveals that Wife admitted under oath that she only paid one month's interest payment for the Otter Pointe home. We found no documentation provided by Wife indicating that she paid anything or would be entitled to an interest deduction even if she has paid. Because we find no evidence of record to support the contentions of Wife, the issue is denied.

## V. CONCLUSION

The judgment of the trial court is affirmed and the case remanded. Costs of the appeal are taxed to the appellant, Lisa Denise Brown (Church).

_____
JOHN W. McCLARTY, JUDGE

-17-